JEFFER MANGELS BUTLER & MITCHELL LLP
STANLEY M. GIBSON (Bar No. 162329)
*sgibson@jmbm.com*
GREGORY S. CORDREY (Bar No. 190144)
*gcordrey@jmbm.com*
JOSEPH J. MELLEMA (Bar No. 248118)
*jmellema@jmbm.com*
JESSICA P.G. NEWMAN (Bar No. 309170)
*jnewman@jmbm.com*
3 Park Plaza, Suite 1100
Irvine, California 92614-2592
Telephone:   (949) 623-7200
Facsimile:   (949) 623-7202

Attorneys for Defendants WESTERN
DIGITAL CORPORATION and
WESTERN DIGITAL TECHNOLOGIES,
INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| DATA SCAPE LIMITED,<br><br>            Plaintiff,<br><br>      v.<br><br>WESTERN DIGITAL<br>CORPORATION, WESTERN<br>DIGITAL TECHNOLOGIES, INC.,<br><br>            Defendants. | Case No. 8:18-cv-02285-DOC-KES<br><br>**WESTERN DIGITAL CORPORATION AND WESTERN DIGITAL TECHNOLOGIES, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Complaint filed:  December 26, 2018<br><br>The Hon. David O. Carter |

**TO DATA SCAPE LIMITED AND ITS COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** on May 6, 2019, at 8:30 a.m., or as soon thereafter as counsel may be heard, in the courtroom of the Honorable DAVID O. CARTER, located in the Ronald Reagan Federal Building, United States Courthouse, 411 West Fourth Street, Courtroom 9D, Santa Ana, CA, Western Digital Corporation and Western Digital Technologies, Inc. (collectively, "Western Digital" or "Defendants") will and hereby do move this Court to dismiss this case with prejudice for failure to state a claim. Dismissal is warranted because the claims of all four asserted patents are directed to patent-ineligible subject matter in violation of 35 U.S.C. § 101 and therefore are invalid.

This Motion is based on this Notice of Motion, the attached Memorandum of Points and Authorities, and the Declaration of Joseph Mellema, filed concurrently herewith, all of the pleadings, files, and records in this proceeding, all other matters of which the Court may take judicial notice, and any argument or evidence that may be presented to or considered by the Court prior to its ruling.

This Motion is made following the conference of counsel for Western Digital and counsel for Data Scope Limited ("Data Scape") pursuant to Local Rule 7-3. Counsel for Western Digital and counsel for Data Scape met and conferred by phone on March 28, 2019 regarding this Motion. The parties were unable to reach resolution and Data Scape opposes the Motion.

1    DATED:  April 5, 2019

JEFFER MANGELS BUTLER &
MITCHELL LLP
JOSEPH J. MELLEMA

By:    /s/ Jospeh J. Mellema
_____
JOSEPH J. MELLEMA
Attorneys for Defendants WESTERN
DIGITAL CORPORATION and
WESTERN DIGITAL TECHNOLOGIES,
INC.

JMBM | Jeffer Mangels
Butler & Mitchell LLP

63NOTICE OF MOTION AND MOTION OF WESTERN DIGITAL CORPORATION AND WESTERN DIGITAL
TECHNOLOGIES, INC. TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES

# **TABLE OF CONTENTS**

**Page**

_Toc5376867I....................................................................................INTRODUCTION
.................................................................................................................... 1

II.    BACKGROUND ................................................................................. 2

   A.    The Morohashi patents .............................................................. 2

   B.    The '893 patent ........................................................................ 4

   C.    Data Scape's Interpretation of the Asserted Claims ................. 7

III.   APPLICABLE LEGAL STANDARDS ............................................. 7

   A.    Standard Under 12(b)(6) ........................................................... 7

   B.    Patent Eligibility Under 35 U.S.C. § 101 ................................ 8

   C.    Ripeness of Deciding Patent Eligibility and Defendant's Burden ......... 9

IV.    ARGUMENT ..................................................................................... 10

   A.    Step One: the Claims are Directed to an Abstract Idea ....................... 10

      1.    Claim 19 of the '929 Patent Is Representative of the Asserted Patents ........ 10

      2.    The Gist of the Asserted Claims is an Abstract Idea ................. 11

      3.    Courts Routinely Invalidate Patents Claiming Similar Abstract Ideas ....... 13

   B.    Step Two: the Claims Do Not Contain An Inventive Concept Transforming the Claimed Abstract Idea into Patent-Eligible Subject Matter ........ 16

      1.    The Asserted Patents Claim Only Generic Computer Functions Using Conventional Components ................... 17

      2.    The Specifications of the Asserted Patents Confirm that the Claimed Functions Were Well-Known and Routine; the Claimed Computer is Used Only to Automate a Manual Process ........... 19

      3.    The Remaining Claims of the Asserted Patents Equally Lack an Inventive Concept ........................ 21

V.    CONCLUSION ................................................................................. 24

JMBM | Jeffer Mangels
Butler & Mitchell LLP

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE**

*Accenture Global Servs., GmbH v. Guidewire Software, Inc.*,
　728 F.3d 1336 (Fed. Cir. 2013) ................................................................ 4

*Affinity Labs of Texas, LLC v. Amazon.com, Inc.*,
　838 F.3d 1266 (Fed. Cir. 2016) ....................................................... 13, 16

*Affinity Labs of Texas, LLC v. DIRECTV, LLC*,
　838 F.3d at 1264 ....................................................................................... 21

*Alice Corp. Pty. Ltd. v. CLS Bank Intern.*,
　134 S. Ct. 2347 (2014)..................................................................... passim

*Ashcroft v. Iqbal*,
　556 U.S. 662 (2009) ............................................................................ 7, 8

*Bascom Research, LLC v. LinkedIn, Inc.*,
　77 F. Supp. 3d 940 (N.D. Cal 2015)...................................................... 11

*Bell Atl. Corp. v. Twombly*,
　550 U.S. 544 (2007) ............................................................................ 7, 8

*Berkheimer v. HP Inc.*,
　881 F.3d 1360 (Fed. Cir. 2018) .............................................................. 9

*Cal. Inst. of Tech. v. Hughes Communs., Inc.*,
　59 F. Supp. 3d 974 (C.D. Cal. 2014).................................................... 12

*Cedars Sinai Med. Ctr. v. Quest Diagnostic Inc.*,
　2018 WL 2558385 (C.D. Cal. Feb. 12, 2018) ..................................... 10

*CertusView Techs., LLC v. S & N Locating Servs., LLC*,
　111 F. Supp. 3d 688 (E.D. Va. 2015), *aff'd*, 695 Fed. Appx. 574
　(Fed. Cir. 2017) ..................................................................................... 15

*Clarilogic, Inc. v. Formfree Holdings Corp.*,
　681 Fed. Appx. 950 (Fed. Cir. 2017) ............................................. 17, 18

*Cloud Satchel, LLC v. Amazon.com, Inc.*,
　76 F. Supp. 3d 553 (D. Del. 2014), *aff'd sub nom. Cloud Satchel,
　LLC v. Barnes & Noble, Inc.*, 626 Fed. Appx. 1010 (Fed. Cir. 2015) ................ 18

ii

*CMG Fin. Servs. v. Pac. Trust Bank, FSBi*,
　50 F. Supp. 3d 1306 (C.D. Cal. 2014) ................................................. 11

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
　776 F.3d 1343 (Fed. Cir. 2014) ............................................... 9, 11, 13

*Diamond v. Diehr*,
　450 U.S. 175 (1981) ........................................................................ 21

*Digitech Image Technologies, LLC v. Electronics for Imaging, Inc.*,
　758 F.3d 1344 (Fed. Cir. 2014) ....................................................... 14

*Elec. Power Grp., LLC v. Alstom S.A.*,
　830 F.3d 1350 (Fed. Cir. 2016) ................................................. 11, 17

*Enfish, LLC v. Microsoft Corp.*,
　56 F. Supp. 3d 1167 (C.D. Cal. 2014) ............................................. 12

*Genetic Techs. Ltd. v. Bristol-Myers Squibb Co.*,
　72 F. Supp. 3d 521 (D. Del. 2014), *aff'd sub nom. Genetic Techs. Ltd. v. Merial LLC*, 818 F.3d 1369 (Fed. Cir. 2016) ............................. 9

*Glasswall Sols. Ltd. v. Clearswift Ltd.*,
　2018 WL 6720014 (Fed. Cir. Dec. 20, 2018) ......................... 16, 19, 20

*In re Roslin Inst. (Edinburgh)*,
　750 F.3d 1333 (Fed. Cir. 2014) ......................................................... 9

*In re TLI Commc'ns LLC Patent Litig.*,
　823 F.3d 607 (Fed. Cir. 2016) ................................................. 9, 14, 17

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
　850 F.3d 1332 (Fed. Cir. 2017) ..................................................... 9, 14

*Intellectual Ventures I LLC v. Symantec Corp.*,
　234 F. Supp. 3d 601 (D. Del. 2017), *aff'd*, 725 Fed. Appx. 976 (Fed. Cir. 2018) .................................................................................... 15

*IPLearn-Focus, LLC v. Microsoft Corp.*,
　2015 WL 4192092 (N.D. Cal. July 10, 2015) ................................... 17

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
　519 F.3d 1025 (9th Cir. 2008) ........................................................... 8

Jeffer Mangels
Butler & Mitchell LLP

JMBM

iii

63NOTICE OF MOTION AND MOTION OF WESTERN DIGITAL CORPORATION AND WESTERN DIGITAL
TECHNOLOGIES, INC. TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES

*Maxon, LLC v. Funai Corporation, Inc.*,
   726 Fed. Appx. 797 (Fed. Cir. 2018) ................................................................17

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
   566 U.S. 66 (2012) ...........................................................................................8

*Multimedia Plus Inc. v. Playerlync LLC*,
   198 F. Supp. 3d 264 (S.D.N.Y. 2016)..........................................................11, 15

*Open Text S.A. v. Box, Inc.*,
   78 F. Supp. 3d 1043 (N.D. Cal. 2015)................................................................12

*SAP Am v. Investpic, LLC*,
   898 F.3d 1161 (Fed. Cir. 2018) .........................................................................13

*Secure Mail Sols. LLC v. Universal Wilde, Inc.*,
   169 F. Supp. 3d 1039 (C.D. Cal. 2016), *aff'd Secure Mail Sols. LLC
   v. Universal Wilde, Inc.*, 873 F.3d 905 (Fed. Cir. 2017)....................11, 12, 14, 15

*Secured Mail Sols. LLC v. Universal Wilde, Inc.*,
   873 F.3d 905 (Fed. Cir. 2017) .......................................................................9, 14

*Synopsis, Inc. v. Mentor Graphics Corp.*,
   839 F.3d 1138 (Fed. Cir. 2016) .........................................................................11

*Two-way Media v. Comcast Cable Comm'ns, LLC*,
   874 F.3d 1333 (Fed. Cir. 2017) .........................................................................14

*Ultramercial, Inc. v. Hulu, LLC*,
   772 F.3d 709 (Fed. Cir. 2014) ..........................................................10, 15, 17, 19

*Univ. of Fla. Research Found., Inc. v. Gen. Elec. Co.*,
   2019 WL 921859 (Fed. Cir. Feb. 26, 2019)............................................16, 19, 20

*WalkMe Ltd. v. Pendo.io, LLC*,
   2019 U.S. Dist. LEXIS 56640 (S.D.N.Y. Apr. 2, 2019)..........................15, 16, 20

*Wireless Media Innovations v. Maher Terminals, LLC*,
   100 F. Supp. 3d 405 (D.N.J. 2015).....................................................................10

**STATUTES**

35 U.S.C. § 101..................................................................................................passim

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 12(b)(6)....................................................... 7

v

Case No. 8:18-cv-02285-DOC-KES
NOTICE OF MOTION AND MOTION OF WESTERN DIGITAL CORPORATION AND WESTERN DIGITAL
TECHNOLOGIES, INC. TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Plaintiff Data Scape Limited's ("Data Scape") patents-in-suit[1] are ripe for a determination of invalidity pursuant to 35 U.S.C. § 101 under the Supreme Court's two-part test in *Alice Corp. Pty. Ltd. v. CLS Bank Intern.*, 134 S. Ct. 2347 (2014).

The claims of Data Scape's four Asserted Patents are directed to the abstract idea of transferring selected data from one storage location to another storage location, therefore failing Step One of *Alice*. The shared specification of the Morohashi Patents describes the claimed systems and methods as "transmitting a plurality of pieces of data from equipment for storing data to other equipment." (Dkt. 1-1 at 1:13-14.) The '893 patent's specification, reciting very similar subject matter, describes the claimed systems and methods as "record[ing], onto one recording medium, data recorded on another recording medium . . . ." (Dkt. 1-5, 1:25-26). Data Scape's infringement allegations and its own characterizations of its patents bear witness to this fact. Courts have consistently found that transferring data from one medium to another, as claimed in the Asserted Patents, to be an abstract idea and thus unpatentable subject matter.

The claims also lack any inventive concept that would transform them into patent-eligible subject matter. The claims merely recite generic, routine computer functions that the Asserted Patents admit were well known and the claimed inventions perform these known operations using generic, conventional computer components. Nothing more is recited, much less any features that are inventive.

Under the Supreme Court's two-part test, the claims are therefore invalid and the Court should dismiss Data Scape's complaint for failure to state a claim.

---

[1] Data Scape filed suit against Western Digital for allegedly infringing U.S. Patent Nos. 7,617,537 (the "'537 patent"), 7,720,929 (the "'929 patent"), 8,386,581 (the "'581 patent", collectively with the '537 patent and the '929 patent, the "Morohashi Patents"), and 9,715,893 (the "'893 patent", collectively with the "Morohashi Patents", the "Asserted Patents").

Case No. 8:18-cv-02285-DOC-KES

NOTICE OF MOTION AND MOTION OF WESTERN DIGITAL CORPORATION AND WESTERN DIGITAL TECHNOLOGIES, INC. TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES

63495690v4

JMBM | Jeffer Mangels Butler & Mitchell LLP

## II.    BACKGROUND

### A.    The Morohashi patents

The three asserted Morohashi Patents are based on the same Japanese parent application and are generically titled "Communication System and Its Method and Communication Apparatus and Its Method."  Their shared specification describes a system and method for transferring music onto a portable playback device.  ('929 patent, 2:43-47, Dkt. No. 1-1.)  The patents purport to address the "cumbersome work" associated with having to "select[] pieces of music [] to be transferred piece by piece" by creating "a list of selected pieces of music" and then transferring "the selected musical data on the list" from a music storage device to the playback device.  (*Id.*, 2:25-34.)  To implement the patented method, the specification of the Morohashi Patents describes the use of only conventional components performing their basic functions.  (*See id.*, 8:39-42, 12:65-70, 13:5-8, and 14:1-5.) The patents claim no improvement to computer technology.  Rather, the patents describe editing a list of music to transfer and then transferring the musical data corresponding to the edited list, using standard computer components.  (*See e.g., id.*, 2:30-34, 22:29-32, and 24:43-45.)  Claim 19 of the '929 Patent is representative of the Morohashi Patents and recites:

> 19.  A communication method, comprising the steps of
>
> editing management information of data to be transferred from an apparatus to an external apparatus by selecting certain data to be transferred, said management information stored in a storage medium of the apparatus, without regard to the connection of said apparatus and said external apparatus;
>
> detecting, at the apparatus, whether said apparatus and said external apparatus are connected;
>
> comparing at the apparatus, said edited management

NOTICE OF MOTION AND MOTION OF WESTERN DIGITAL CORPORATION AND WESTERN DIGITAL TECHNOLOGIES, INC. TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES
63495690v4

1  information with management information of data stored in said
2  external apparatus; and

3      transmitting the selected data from said apparatus to said
4  external apparatus based on said management information and a result
5  of the comparison when said detection indicates that said apparatus
6  and said external apparatus are connected.

7  The "editing" step of claim 19 involves selecting data for transfer by creating
8  or modifying a "management information" (referred to as a list in other of the
9  Morohashi Patent claims).  The "detecting" step involves detecting whether the two
10 apparatuses are connected.  The "comparing" step involves comparing the edited
11 management information or list to data already present on the receiving apparatus,
12 and the "transmitting" step involves sending the selected data to the second
13 apparatus based on the "comparing" step, when the apparatuses are connected.  The
14 apparatus, system, and storage medium claims of the '929 patent all directly
15 correspond with the method claims, as they recite only functional, generic
16 components configured to perform the method steps.  (*See, e.g.*, '929 patent, cl. 1: a
17 "communication system" with an "apparatus comprising," e.g., a "storage medium
18 configured to store management information," "a communicator configured to
19 communicate," "a detector configured to detect," "an "editor configured to select");
20 cl. 10: a "communication apparatus" comprising a "storage medium configured to
21 store," an "editor configured to select" and a "controller configured to control
22 transfer".)  The claims of the other Morohashi Patents are substantially similar to
23 those of the '929 patent, and in fact, the '537 and the '581 patents are subject to
24 terminal disclaimers.  The minor differences in the claims do not contribute patent-
25 eligible subject matter. For instance, claim 1 of the '537 patent recites "judging"
26 whether the two apparatuses are connected, which is similar to the "detecting" step
27 of the '929 patent.  ('537 patent, cl. 1, Dkt. No. 1-2.)  Additionally, the claimed
28 method compares two lists, each associated with a device, but limits the transferring

JMBM | Jeffer Mangels Butler & Mitchell LLP

step to only the selected data that is not already on the receiving device.  (*Id.*)  Claim 15 of the '581 patent includes the additional steps of "extracting" a list of data from among a plurality of lists and "associating" the list with a unique identifier of the second apparatus.  ('581 patent, cl. 15, Dkt. No. 1-3.)  Like the '929 patent, the apparatus, system, and storage medium claims of the '537 and '581 patents directly correspond with the method claims recited therein, as they too recite only functional, generic components configured to perform the method steps.  (*See, e.g.*, '581 patent, cl. 1:  "a communication apparatus comprising a storage unit configured to store," "a communication unit configured to communicate," "a controller configured to edit a list," etc.; '537 patent cl. 15: "a communication apparatus" comprising a "a processor configured to execute said program" which operates to "judge," "compare," "transfer," and "delete"; '751 patent, claim 1: "A communication apparatus" comprising "a storage medium configured to store," "a communicator configured to communicate," "a detector configured to detect," "an editor configured to select," etc.)  Thus, claim 19 of the '929 patent is representative not only of the other claims in the '929 patent, but of the claims in all of the Morohashi Patents.  *See Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1341 (Fed. Cir. 2013) ("System claims that closely track method claims and are grounded by the same meaningful limitations will generally rise and fall together.").  In short, this family of patents has claims directed to performing well-known computer functions using general computer technology, with no inventive teaching within the field of computers.

### B.    The '893 patent

The '893 patent is entitled "Recording Apparatus, Server Apparatus, Recording Method, Program and Storage Medium" and is directed generally to "ripping" operations, defined in the specification as the operation through which "audio data recorded on a CD (Compact Disk) is compressed and recorded onto a hard disk for storage."  ('893 patent, 1:41-44, Dkt. No. 1-5.)  According to the

63495690v4

specification "synchronized ripping"—where "all tracks recorded on the CD are unconditionally transferred to the hard disk for recording"—is problematic because "[s]ome tracks, which have already been ripped, are duplicated in the recording on the hard disk," thereby wasting "the capacity of the hard disk" and lengthening the amount of time required to rip the CD. (*Id.*, 2:6-8, 2:8-12, 2:18-22.)  To avoid this duplication, the patent explains, the user must "select tracks to be ripped . . . before the ripping operation," which in turn requires the user to check "whether the tracks recorded on the rip source CD" are already on the hard disk. (*Id.*, 2:33-40.)  This, according to the patent, is time consuming and impractical. (*Id.*, 2:33-59.)

Accordingly, the stated "object" of the invention is to "provide a high-speed ripping technique in which when data that is recorded on a storage medium such as a CD by track (program) is ripped, already ripped tracks are not ripped in duplication." (*Id.*, 2:63-67.)  This object is achieved by performing the ripping operation only "after the already ripped tracks are automatically recognized," which is accomplished through the comparison of a "Table of Contents" ("TOC") read from the CD to the TOC of the tracks stored in the ripping database of the second apparatus. (*Id.*, 3:1-3.)  The specification refers to the TOC of the CD as "first management data." (*Id.*, 30:39-40.)  The TOC of the ripping database, on the other hand, is a part of the "album information," which the specification refers to as "second management data." (*Id.*, 5:39-41; 15:45-47; 30:40-42.)

The '893 patent states several times throughout the specification that its goal is to automate a process ordinarily performed by a user (a person):

> The present embodiment not only avoids useless duplication of the ripped file, but also reduces the time required for CD synchronized ripping (performs the ripping operation at a high speed). Operations required to avoid duplication and to achieve high-speed ripping, such as the recognition of the unrecorded track and the replay of the unrecorded track only, are all ***automatically*** performed. The user is thus freed from the troublesome operation and steps. (*Id.*, 13:30-37, emphasis added.)

\*\*\*

In accordance with the present invention as described above, the

63495690v4

operation to recognize the data unrecorded on the second storage medium (as the ripping state) out of the data recorded on the first storage medium, and the operation to replay only the unrecorded data to be ripped based on the recognition result from the first storage medium (for program replay) are ***automatically*** performed without user intervention based on the result of comparison (check) of the first management data (TOC of the CD) read from the first storage medium with the second management data (album information) produced from the first management data. In other words, the ripping operation of the present invention is ***automatically*** executed without the need for user operation, and improves the ease of use of the apparatus. (*Id.*, 30:32-45, emphasis added.)

As set forth below, claim 12 is representative of the '893 patent claims and recites a method that automates transferring selected data from one source to another:

12. A method of an information processing apparatus for transferring data, the method comprising:

***automatically*** reading first management data from a first storage medium, the first management data identifying files of source data recorded on the first storage medium;

***automatically*** identifying, by circuitry of the information processing apparatus, one of the files of source data based on the first management data and second management data, the second management data identifying files of transferred data stored on a second storage medium, the one of the files of source data being absent from the second storage medium; and

***automatically*** transferring the one of the files of source data to the second storage medium, the one of the files of source data being transferred becoming one of the files of transferred data; and

***automatically*** displaying transferring status of the one of the files of source data by a symbolic figure.  (Emphasis added.)

Because the claims of the '893 Patent recite the same generic steps of transferring selected data from one source to another as recited in Morohashi

1  patents, claim 19 of the '929 Patent is representative of the claims in the

2  Asserted Patents.

3      **C.**    **Data Scape's Interpretation of the Asserted Claims**

4         Data Scape has asserted that Western Digital infringes the Asserted Patents

5  through products and services that do **not** involve ripping selected music tracks or

6  transferring musical tracks to a portable playback device.  Instead, Data Scape

7  alleges that Western Digital's "MyCloud series devices, WD Smartware software,

8  WD Sync software, [and] WD Backup software" infringe the Asserted Patents.

9  (Complaint, Dkt. 1, ¶¶ 8, 26, 45, 63).  Data Scape alleges these products

10  "communicate data stored on device (e.g., MyCloud server or a computer) to

11  another device (e.g., a computer, a USB device, a cloud backup service, or a

12  connected MyCloud server.)"  (*Id*., ¶ 11).  Accordingly, Data Scape is necessarily

13  interpreting the claims of the Asserted Patents to attempt to cover any system,

14  method or apparatus in which selected data of any type is transferred from a first

15  storage location (e.g., a computer or server) to a second storage location (e.g., a

16  computer, a server, or USB device).  Indeed, Data Scape, in a complaint it recently

17  filed in the International Trade Commission ("ITC") involving the Morohashi

18  Patents, asserted that the claims "are not limited to music files but have broad

19  application to the transfer of data generally."  (*See* Declaration of Joseph Mellema

20  ("Mellema Dec."), Ex. A ("ITC Complaint"), ¶¶ 31, 42, 53 (description for the '929,

21  '537, and '581 patents).)

22  **III.**    **APPLICABLE LEGAL STANDARDS**

23      **A.**    **Standard Under 12(b)(6)**

24         Under Federal Rule of Civil Procedure 12(b)(6), a complaint must be

25  dismissed when a plaintiff's allegations fail to set forth a set of facts which, if true,

26  would entitle the complainant to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

27  555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (holding that a claim must

28  be facially plausible in order to survive a motion to dismiss).  The pleadings must

NOTICE OF MOTION AND MOTION OF WESTERN DIGITAL CORPORATION AND WESTERN DIGITAL
TECHNOLOGIES, INC. TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES

63495690v4

JMBM | Jeffer Mangels
Butler & Mitchell LLP

1    raise the right to relief beyond the speculative level; a plaintiff must provide "more

2    than labels and conclusions, and a formulaic recitation of the elements of a cause of

3    action will not do." *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S.

4    265, 286 (1986)).  On a motion to dismiss, courts accept as true a plaintiff's well-

5    pleaded factual allegations and construes all factual inferences in the light most

6    favorable to the plaintiff.  *See Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519

7    F.3d 1025, 1031 (9th Cir. 2008).  However, the court is not required to accept as

8    true legal conclusions couched as factual allegations.  *Iqbal*, 556 U.S. at 678.

9         **B.**       **Patent Eligibility Under 35 U.S.C. § 101**

10        Section 101 of the Patent Act provides that a patent may be obtained for "any

11   new and useful process, machine, manufacture, or composition of matter, or any

12   new and useful improvement thereof."  35 U.S.C. § 101.  The Supreme Court has

13   "long held that this provision contains an important implicit exception: Laws of

14   nature, natural phenomena, and abstract ideas are not patentable."  *Alice*, 537 U.S.

15   208, 216 (2014).  "The concern that drives this exclusionary principle" is "one of

16   pre-emption."  *Id.*  In other words, the concern is "'that patent law not inhibit further

17   discovery by improperly tying up the future use of' these building blocks of human

18   ingenuity."  *Id.* (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566

19   U.S. 66, 85 (2012)).  *Alice* warns courts, however, to "tread carefully in construing

20   this exclusionary principle lest it swallow all of patent law," because "[a]t some

21   level, 'all inventions . . . embody, use, reflect, rest upon, or apply laws of nature,

22   natural phenomena, or abstract ideas.'"  *Id.* (quoting *Mayo*, 566 U.S. at 71).

23        In *Alice*, the leading case on patent-eligible subject matter under § 101, the

24   U.S. Supreme Court refined the "framework for distinguishing patents that claim

25   laws of nature, natural phenomena, and abstract ideas from those that claim patent-

26   eligible applications of those concepts" originally set forth in *Mayo*, 566 U.S. at 77.

27   *Alice*, 537 U.S. at 217.  This analysis, generally known as the "*Alice*" framework,

28   proceeds in two steps as follows:

JMBM | Jeffer Mangels Butler & Mitchell LLP

NOTICE OF MOTION AND MOTION OF WESTERN DIGITAL CORPORATION AND WESTERN DIGITAL
TECHNOLOGIES, INC. TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES
63495690v4

First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts. If so, we then ask, "[w]hat else is there in the claims before us?" To answer that question, we consider the elements of each claim both individually and "as an ordered combination" to determine whether the additional elements "transform the nature of the claim" into a patent-eligible application. We have described step two of this analysis as a search for an "'inventive concept'"—i.e., an element or combination of elements that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself."

*Id*. at 217-18 (alterations in original) (citations omitted*); see also In re TLI Commc'ns LLC Patent Litig*., 823 F.3d 607, 611 (Fed. Cir. 2016) (describing "the now familiar two-part test described by the [U.S.] Supreme Court in *Alice*").

### C.   Ripeness of Deciding Patent Eligibility and Defendant's Burden

The ultimate question whether a claim recites patent-eligible subject matter under § 101 is a question of law. *Intellectual Ventures I LLC v. Capital One Fin. Corp*., 850 F.3d 1332, 1338 (Fed. Cir. 2017) ("Patent eligibility under § 101 is an issue of law[.]"); *In re Roslin Inst. (Edinburgh)*, 750 F.3d 1333, 1335 (Fed. Cir. 2014) (same). However, the Federal Circuit has identified that there are certain factual questions underlying the § 101 analysis. *See Berkheimer v. HP Inc*., 881 F.3d 1360, 1368-69 (Fed. Cir. 2018). Where the court has a "full understanding of the basic character of the claimed subject matter," the question of patent eligibility may properly be resolved on the pleadings. *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1349 (Fed. Cir. 2014); *see also Genetic Techs. Ltd. v. Bristol-Myers Squibb Co*., 72 F. Supp. 3d 521, 539 (D. Del. 2014), *aff'd sub nom. Genetic Techs. Ltd. v. Merial LLC*, 818 F.3d 1369 (Fed. Cir. 2016). Accordingly, a district court may determine patent eligibility under § 101 in a motion to dismiss. *See, e.g., Secured Mail Sols. LLC v. Universal Wilde, Inc*., 873 F.3d 905, 912 (Fed. Cir. 2017) (affirming determination of ineligibility made on 12(b)(6) motion); *Content Extraction*, 776 F.3d at 1345 (same).

"Patent eligibility under § 101 is a question of law that may, in appropriate cases, be decided on the pleadings without the benefit of a claims construction

JMBM | Jeffer Mangels
Butler & Mitchell LLP

1 hearing." *Modern Telecom Sys. LLC v. Juno Online Servs.*, SACV 14-0348-DOC,

2 2015 U.S. Dist. LEXIS 33835, at *6 (C.D. Cal. Mar. 17, 2015) (citing *Content*

3 *Extraction*, 776 F.3d at 1349 for "affirming district court's decision to grant motion

4 to dismiss based on patent ineligible subject matter under § 101 without having a

5 claims construction hearing"); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 711

6 (Fed. Cir. 2014) (same).  While the parties unquestionably disagree on claim

7 construction with respect to infringement, resolution of such disputes is not

8 necessary to rule on the instant motion, as they are not relevant to the §101

9 determination.  *See Cedars Sinai Med. Ctr. v. Quest Diagnostic Inc.*, 2018 WL

10 2558385, at *8 (C.D. Cal. Feb. 12, 2018) (claims require construction before ruling

11 on a §101 motion "only where claim construction disputes are relevant to the § 101

12 question.").  The claims of the Asserted Patents are impermissibly directed to an

13 abstract idea whether they are construed broadly, as Plaintiff's complaint suggests,

14 or they are construed more narrowly, in accordance with the description in the

15 specification.  *See, e.g., Wireless Media Innovations v. Maher Terminals, LLC*, 100

16 F. Supp. 3d 405, 410 (D.N.J. 2015) (quoting *DietGoal Innov. LLC v. Bravo Media*

17 *LLC*, 33 F. Supp. 3d 271, 289 (S.D.N.Y. 2014) (no need to construe claims for §101

18 when "the computerized process disclosed in the [] patent is invalid under §101

19 under any reasonable construction.")).  Indeed, "the Federal Circuit has

20 acknowledged that for purposes of making a determination at the pleading stage, a

21 district court may still consider a 12(b)(6) motion so long as the court construes the

22 claim terms in the manner most favorable to the non-moving party, i.e., the patent

23 owner." *Cedars Sinai*, 2018 WL 2558385, at *8 (citations omitted).

## IV.   ARGUMENT

### A.   Step One: the Claims are Directed to an Abstract Idea

#### 1.   Claim 19 of the '929 Patent Is Representative of the Asserted Patents

As this Court previously noted, it is well-established that courts do not need

1  to assess every claim in conducting a § 101 analysis.  *See Secure Mail Sols. LLC v.*
2  *Universal Wilde, Inc*., 169 F. Supp. 3d 1039, 1046, 1056 (C.D. Cal. 2016) ("in the
3  Court's view, '[n]one of the remaining asserted dependent or independent claims
4  differ substantially' from the claims analyzed above"), *aff'd Secure Mail Sols. LLC*
5  *v. Universal Wilde, Inc.,* 873 F.3d 905 (Fed. Cir. 2017); *CMG Fin. Servs. v. Pac.*
6  *Trust Bank, FSBi,* 50 F. Supp. 3d 1306, 1314 (C.D. Cal. 2014) (citation omitted)
7  ("Comparing the language of the systems claims with that of the method claims, it is
8  clear that these are functionally identical . . . .  Thus, they must be treated as
9  equivalent for purposes of the § 101 analysis."); *see also Bascom Research, LLC v.*
10  *LinkedIn, Inc.*, 77 F. Supp. 3d 940, 943 n.3 (N.D. Cal 2015).

11      For purposes of § 101 analysis, as explained above (*supra* Sections II.A, B),
12  claim 19 may be treated as representative because all of the other claims of the
13  Asserted Patents are "substantially similar and linked to the same abstract idea" of
14  transferring selected data from one storage location to another storage location.  *See*
15  *Content Extraction*, 776 F.3d at 1348 (agreeing that a single identified claim is
16  representative because "the claims of the asserted patents are substantially similar in
17  that they recite little more than the same abstract idea"); *Multimedia Plus Inc. v.*
18  *Playerlync LLC*, 198 F. Supp. 3d 264, 272 (S.D.N.Y. 2016) ("[W]here the claims
19  are 'substantially similar and linked to the same abstract idea,' a court need not
20  address each claim individually.").

21          **2.    The Gist of the Asserted Claims is an Abstract Idea**

22      As stated above, under the first step of the *Alice* test, the Court must
23  determine whether the patent claims at issue are directed to abstract ideas. The
24  Federal Circuit has instructed district courts to examine, at a high level, the *purpose*,
25  *basic thrust*, *focus*, or *gist* of a challenged claim to determine whether it is directed
26  to an abstract idea.  *See Synopsis, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138,
27  1150-51 (Fed. Cir. 2016) (citation omitted) (courts are to "capture[] the 'basic
28  thrust' of the Asserted claims"); *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d

NOTICE OF MOTION AND MOTION OF WESTERN DIGITAL CORPORATION AND WESTERN DIGITAL
TECHNOLOGIES, INC. TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES
63495690v4

1350, 1353 (Fed. Cir. 2016) (Step One requires "looking at the 'focus' of the claims").  Courts in this district thus look to identify the purpose of the claim to determine if it is directed to an abstract idea.  *See Secure Mail Sols.*, 169 F. Supp. 3d at 1046-47; *Cal. Inst. of Tech. v. Hughes Communs., Inc.*, 59 F. Supp. 3d 974, 991 (C.D. Cal. 2014) (requiring that a court "identify the purpose of the claim—in other words, what the claimed invention is trying to achieve—and ask whether that purpose is abstract.").  At Step One, "[c]ourts should recite a claim's purpose at a reasonably high level of generality."  *Enfish, LLC v. Microsoft Corp.*, 56 F. Supp. 3d 1167, 1173 (C.D. Cal. 2014); *see also Open Text S.A. v. Box, Inc.*, 78 F. Supp. 3d 1043, 1046 (N.D. Cal. 2015) (noting that in evaluating the first prong of the *Alice* test, "the Court distills the gist of the claim.")

The gist of the Asserted Claims is transferring specified data from one storage location to another.  Data Scape has confirmed that "the patented technology . . . involves the transfer of selected data from one device to a second device," and that the patents are directed to "systems and methods for communicating selected pieces of data stored in one apparatus, e.g., a server, to another apparatus, e.g., a mobile phone, tablet, or laptop."  (*See* Mellema Decl., Exh. A, ¶¶ 21, 23, 29, 40, 51 (referring to the '929, '537, and '581 patents).  The Asserted Patents further confirm the abstract nature of the alleged invention.  For example, the common specification of the Morohashi Patents explains that "the present invention" relates to a system and method "for transmitting a plurality of pieces of data from equipment for storing data to other equipment."  (*See, e.g.,* '929 patent at 1:10-14, Dkt. 1-2.)  The "Summary of the Invention" of each of the Morohashi Patents states that an object of the invention is to provide a system and method "capable of transferring musical data from an audio server to a portable audio-data playback apparatus with ease."  (*Id.* at 2:43-47.)  The '893 patent's specification also describes the "present invention" as relating to recording "onto one recording medium, data recorded on another recording medium."  (*See* '893 patent at 1:24-26, Dkt. 1-4.)  Accordingly,

NOTICE OF MOTION AND MOTION OF WESTERN DIGITAL CORPORATION AND WESTERN DIGITAL
TECHNOLOGIES, INC. TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES

63495690v4

1  the purpose, or basic gist, of the claims of the Asserted Patents is the abstract idea of

2  transferring specified data from one storage location to another storage location.

**3.    Courts Routinely Invalidate Patents Claiming Similar Abstract Ideas**

5      The Federal Circuit has determined that functional claims, such as those at

6  issue here, were directed to an abstract idea under Section 101.

7      In *Content Extraction*, the Federal Circuit held that claims were "drawn to the

8  abstract idea of 1) collecting data, 2) recognizing certain data within the collected

9  data set, and 3) storing that recognized data in a memory."  776 F.3d at 1347.

10 Indeed, the thrust of the claims at issue in *Context Extraction* involved the same

11 function at issue here of selectively transferring data from one source to another.

12 *Compare Content Extraction,* 776 F.3d at 1345 ("recogniz[ing] information written

13 on a scanned check, such as the check's amount, and populat[ing] certain data fields

14 with that information in a computer's memory") *with* Morohasi Patents' description

15 of "transferring [selected] musical data from an audio server to a portable audio-data

16 playback apparatus."  (Dkt. 1-2 at 2:43-47.)

17     Similarly, in *SAP Am v. Investpic, LLC*, 898 F.3d 1161, 1164-65 (Fed. Cir.

18 2018), the claims were directed to "selecting" and "storing" information,

19 "generating" an analysis of it, and "providing" the analysis to a user.  The Federal

20 Circuit found that such steps were abstract.  *Id.* at 1167.

21     In *Affinity Labs of Texas, LLC v. Amazon.com, Inc.*, 838 F.3d 1266, 1267-69,

22 1272 (Fed. Cir. 2016), the Federal Circuit found the claims there directed to the

23 abstract idea of "streaming user-selected content to a portable device," where the

24 patent claimed a "network based media managing system" for streaming a "library

25 of content" to a "handheld wireless device."  The features of the claimed system

26 recited above were "described and claimed generically rather than with the

27 specificity necessary to show how those components provide[d] a concrete solution

28 to the problem addressed by the patent."  *Id.* at 1271.

In *TLI*, the Federal Circuit found that claims directed to the classification and storage of information was directed to an abstract idea where the claims recited "use of conventional or generic technology in a nascent but well-known environment." 823 F.3d at 612.  The patent there merely recited "a generic environment in which to carry out the abstract idea of classifying and storing digital images in an organized manner" rather than claiming a specific device or solution for achieving the purported improvement in the patent, which was to improve archiving of digital images for faster and easier access to archived information.  *Id.* at 611-12.

In *Secure Mail Sols.,* the Federal Circuit affirmed this Court's holding that claims directed to affixing an identifier (e.g.,  a barcode, QR code (two dimensional barcode) or URL on the outer surface of a mail object (e.g. envelope or package) "does not meaningfully limit the abstract idea of communicating information about a mailpiece by use of marking."  873 F.3d at 906-08.

In *Two-way Media v. Comcast Cable Comm'ns, LLC*, 874 F.3d 1333, 1337-38 (Fed. Cir. 2017) (quotation marks omitted), the Federal Circuit affirmed a finding that patents claiming "a system for streaming audio/visual data over a communications system like the internet" were directed to an abstract idea because the claims required "functional results" such as "converting, routing, controlling, monitoring, and accumulating records," but failed to "sufficiently describe how to achieve these results in a non-abstract way."

In *Digitech Image Technologies, LLC v. Electronics for Imaging, Inc.*, 758 F.3d 1344, 1351 (Fed. Cir. 2014), the Federal Circuit determined that claims reciting "a process of taking two data sets," which were "generated by taking existing information . . . and organizing this information into a new form" and "combining them into a single data set" was an unpatentable abstract idea.  *See also Intellectual Ventures I*, 850 F.3d at 1340 (claims abstract because they "are, at their core, directed to the abstract idea of collecting, displaying, and manipulating data").

District courts also have found that claims similar to those at issue here were

directed to abstract ideas.  *See, e.g., Intellectual Ventures I LLC v. Symantec Corp.*, 234 F. Supp. 3d 601, 607 (D. Del. 2017), *aff'd*, 725 Fed. Appx. 976 (Fed. Cir. 2018) (finding the concept of "copying data from one location to another" to be an "abstract idea"); *CertusView Techs., LLC v. S & N Locating Servs., LLC*, 111 F. Supp. 3d 688, 709-10 (E.D. Va. 2015), *aff'd*, 695 Fed. Appx. 574 (Fed. Cir. 2017) *and aff'd*, 695 Fed. Appx. 574 (Fed. Cir. 2017) ("receiving", "displaying", "adding a digital representation to an image", and "electronically transmitting and/or storing non-image data" is "directed to an abstract idea"); *Multimedia Plus Inc. v. Playerlync LLC*, 198 F. Supp. 3d 264, 271 (S.D.N.Y. 2016), *aff'd*, 695 Fed. Appx. 577 (Fed. Cir. 2017) ("transmitting data from one computer to another" is "a process as old as the internet itself"); *Cellspin Soft, Inc. v. Fitbit*, Inc., 316 F. Supp. 3d 1138, 1150 (N.D. Cal. 2018) (patents related to "acquiring, transferring, and publishing data" were abstract). As the Federal Circuit has emphasized, "the transfer of content between computers is merely what computers do."  *Ultramercial*, 772 F.3d at 717.

In *WalkMe Ltd. v. Pendo.io, LLC*, 2019 U.S. Dist. LEXIS 56640, at *11-12, 14-15 (S.D.N.Y. Apr. 2, 2019), for example, the court found that claims directed to the "desired result" of "automatic generation of a computer code that creates an association between two objects" were directed to an abstract idea.  The court reasoned that "[t]his is not an improvement in computer functionality, but rather a way of using a computer as a tool."  *Id.* at *12.

The claims of the Asserted Patents also lack any specific, technological features and instead merely recite generic components described only by their functions.  As this Court and others have recognized, the recitation of such generic components does not render the claims any less abstract.  *Secure Mail Sols.*, 169 F. Supp. 3d at 1048 (recitation of generic components is "largely irrelevant to the Step One analysis.") (citing cases).  The "communicator," for example, is simply whatever can "communicate data with [the] first apparatus." (*See, e.g.,* '929 patent at 29:8-9.)  Likewise, the "detector" is a black box that just "detect[s] whether [the]

first apparatus and [the] second apparatus are connected." (*Id.* at 29:10-11.) Even the step of comparing and transmitting is described in terms of its function: a generic "controller" is "configured to compare . . . management information [on one apparatus] with management information of data stored [on the other apparatus] and to transmit data . . . based on result of the comparison." (*Id.* at 29:22-26.) The claims are silent as to how "management information" is configured so that a controller can compare two sets of information, or how the controller determines what information to transfer over. *Cf. Univ. of Fla. Research Found., Inc. v. Gen. Elec. Co*., 2019 WL 921859, at *5 (Fed. Cir. Feb. 26, 2019) ("Neither the [] patent, nor its claims, explains *how* the drivers do the conversion that [plaintiff] points to.") (emphasis in original); *Glasswall Sols. Ltd. v. Clearswift Ltd*., 2018 WL 6720014, at *1 (Fed. Cir. Dec. 20, 2018) (criticizing a patent for failing repeatedly "to claim *how*" its various steps were performed) (emphasis in original); *Affinity Labs*, 838 F.3d at 1269 (faulting claims for providing no "limiting detail that confines the claim to a particular solution to an identified problem"). The specification, too, describes this step only in passive, functional terms: "if there is a piece of musical data in common . . . [it] can be omitted." ('929 patent at 27:62–67.)

Finally, the claims of the Asserted Patents are drawn so broadly—encompassing any type of device for transferring any type of data—that they impermissibly preempt all applications of this abstract idea. (Mellema Dec., Ex. A, ¶¶ 3, 42, 53 (the claims "are not limited to music files but have broad application to the transfer of data generally.")); *see Alice Corp.*, 573 U.S. at 216 ("The concern that drives this exclusionary principle" is "one of pre-emption.").

**B.    Step Two: the Claims Do Not Contain An Inventive Concept Transforming the Claimed Abstract Idea into Patent-Eligible Subject Matter**

Under the second step of *Alice*, the Court considers whether the elements of each claim, either individually or "as an ordered combination," include an "inventive concept" such that "'the patent in practice amounts to significantly more

63495690v4

1    than a patent upon the [ineligible concept] itself.'" *Alice*, 573 U.S. at 217 (quoting

2    *Mayo*, 566 U.S. at 79). "A claim that recites an abstract idea must include

3    'additional features' to ensure 'that the [claim] is more than a drafting effort

4    designed to monopolize the [abstract idea].'" *Alice*, 573 U.S. at 209 (quoting *Mayo*,

5    566 U.S. at 77) (alterations in original). "Those 'additional features' must be more

6    than 'well-understood, routine, conventional activity.'" *Ultramercial*, 772 F.3d at

7    715 (quoting *Mayo*, 566 U.S. at 77).  As the "Supreme Court and the Federal Circuit

8    have made perfectly clear, merely implementing an abstract idea on conventional

9    computer technology is not enough." *IPLearn-Focus, LLC v. Microsoft Corp.*, 2015

10   WL 4192092, at *4 (N.D. Cal. July 10, 2015); *see also In re TLI Commc'ns LLC*,

11   823 F.3d at 613 (citation omitted); *see also id*. (ruling that "telephone unit,"

12   "server," "image analysis unit," and "control unit" limitations were insufficient to

13   satisfy *Alice* step two where claims were drawn to abstract idea of classifying and

14   storing digital images in an organized manner).

                  **1.**    **The Asserted Patents Claim Only Generic Computer**
15                             **Functions Using Conventional Components**
16

17          Courts routinely find that claims lack an inventive concept where, as here,

18   they "require only off-the-shelf conventional computer" technology for performing

19   basic computer functions.  *Clarilogic, Inc. v. Formfree Holdings Corp.*, 681 Fed.

20   Appx. 950, 954-55 (Fed. Cir. 2017) (finding claims invalid because they were

21   "directed to a result or effect that itself is the abstract idea and merely invoke[]

22   generic processes and machinery"); *Maxon, LLC v. Funai Corporation, Inc.*, 726

23   Fed. Appx. 797, 800 (Fed. Cir. 2018) (claims fail to "transform the claimed abstract

24   idea into eligible patent matter" where they "merely recite generic computer

25   elements for their basic functions"); *Elect. Power Group*, 830 F.3d at 1353-56 (no

26   inventive concept where claims "require anything other than off-the-shelf

27   conventional computer . . . technology"); *TLI*, 823 F.3d at 613 (citations omitted)

28   ("It is well-settled that mere recitation of concrete tangible components is

63495690v4

1   insufficient to confer patent eligibility of an otherwise abstract idea. Rather, the

2   components must involve more than performance of 'well-understood, routine,

3   conventional activit[ies] previously known to the industry'").

4       Representative claim 19 of the '929 patent recites *__only__* routine, generic

5   computer functions such as "editing", "detecting", "comparing", and

6   "transmitting."[2]  A generic computer comprising conventional components such as a

7   processor, non-transient memory, transient memory, buses, network interface cards,

8   etc., uses those components to perform these generic functions.  No particular

9   improvement is recited in the claim, and it does nothing more than that which "can

10  be achieved by any general purpose computer without special processing." *See,*

11  *e.g., Cloud Satchel, LLC v. Amazon.com, Inc.*, 76 F. Supp. 3d 553, 564 (D. Del.

12  2014), *aff'd sub nom. Cloud Satchel, LLC v. Barnes & Noble, Inc.*, 626 Fed. Appx.

13  1010 (Fed. Cir. 2015) (quoting *In re Katz Interactive Call Processing Patent Litig.*,

14  639 F.3d 1303, 1316 (Fed. Cir. 2011)).

15      For example, the "detecting" step simply detects whether a connection is

16  established, of which "there are a variety of conceivable methods" according to the

17  specification to achieve detection.  ('929 patent at 31:8-9; 26:16-18.)  The "editing"

18  step merely edits "management information" prior to a connection being made.  (*Id.*

19  at 31:2-7.)  But editing a file in memory does not constitute an inventive step, and

20  the Morohashi patents do not reveal—much less claim—a specific methodology that

21  is utilized to achieve a particular innovation in editing management information.  *Cf.*

22  *Clarilogic*, 681 Fed. Appx. at 950 (claim patent-ineligible because "it does not claim

23  the technical manner in which financial data is gathered, analyzed, or output");

---

24

25  [2] While the purpose of utilizing a representative claim is to simplify the analysis in situations where patents' claims are "substantially similar and linked to the same

26  abstract idea," none of the other claims of the Morohashi Patents or the '893 patent claims, add anything more than completely functional language.  For example, claim

27  1 of the '929 patent recites an "editor", a "detector", a "controller [] configured to compare [and] transmit", a "storage medium", and a "communicator."  Likewise,

28  the claims of the '893 patent recite similarly generic computer functions, including "reading," "identifying," "transferring" and "displaying."

JMBM | Jeffer Mangels
Butler & Mitchell LLP

1 *Univ. of Fla. Research Found.*, 2019 WL 921859, at *5 ("Neither the [] patent, nor

2 its claims, explains how the drivers do the conversion that UFRF points to");

3 *Glasswall Sols*, 2018 WL 6720014, at *1 (criticizing patent for failing "to claim

4 how" the claimed steps were performed).  Nor does the patent even suggest that

5 editing "management information" is innovative in any way.  The "comparing" step

6 simply compares whether the management information is the same as edited

7 management information.  ('929 patent at 31:10-12.)  The "transmitting" step

8 simply transmits selected data from one storage medium to another.  (*Id.* at 31:13-

9 17.)  In short, Data Scape's attempt to tether its abstract idea of selectively

10 transferring files from one device to another using computer technology is

11 insufficient because "[a]ny transformation from the use of computers or the transfer

12 of content between computers is merely what computers do and does not change this

13 analysis." *Ultramercial,* 772 F.3d at 716-717.

14     Accordingly, the claimed functions are only generic, routine computer

15 functions performed by generic, conventional computer parts, and are not inventive.

16     **2.**    **The Specifications of the Asserted Patents Confirm that the Claimed Functions Were Well-Known and Routine; the**

17 **Claimed Computer is Used Only to Automate a Manual Process**

18

19     The Asserted Patents confirm that the claimed functions were well-known

20 and could be performed without the application of a computer.  The Morohashi

21 Patents' common specification discusses moving audio data stored on one storage

22 device to another on a "piece by piece" basis ('929 patent at 2:13-17, 24-27), and

23 that an object of the patents was to transfer "musical data from an audio server to a

24 portable audio-data playback apparatus with ease" (*id*. at 2:43-47).  Similarly, the

25 '893 patent's specification is replete with statements revealing that the object of the

26 purported invention was to computerize or automate an existing method to make it

27 more convenient for the user and to quicken the copying process (*see* '893 patent,

28 2:23-56) (noting that the duplication inherent in prior art ripping operations was

"inconvenient to the user" and could be avoided only by the user manually selecting music tracks that previously have not been ripped).

Representative claim 12 of the '893 patent recites elements such as "automatically reading . . .," "automatically identifying . . .," "automatically transferring . . .," and "automatically displaying . . . ." Moreover, the specification of the '893 patent states that "[o]perations required to avoid duplication and to achieve high-speed ripping, such as the recognition of the unrecorded track and the replay of the unrecorded track only, are all ***automatically*** performed. The user is thus freed from the troublesome operation and steps (*id.*, 13:30-37, emphasis added), "the operation to recognize the data unrecorded on the second storage medium (as the ripping state) out of the data recorded on the first storage medium, and the operation to replay only the unrecorded data to be ripped based on the recognition result from the first storage medium (for program replay) are ***automatically*** performed without user intervention . . ." (*id.*, 30:33-39, emphasis added) and "the ripping operation of the present invention is ***automatically*** executed without the need for user operation, and improves the ease of use of the apparatus (*id.*, 30:43-45, emphasis added).[3]

It is well settled that simply computerizing or automating an otherwise manual, routine task is not inventive, particularly to achieve tasks more efficiently or accurately. *See OIP*, 788 F.3d at 1363 ("[R]elying on a computer to perform routine tasks more quickly or more accurately is insufficient to render a claim patent eligible."); *Univ. of Fla. Research Found.*, 2019 WL 921859, at *4-5 (characterizing patent seeking "to automate 'pen and paper methodologies' to conserve human resources and minimize errors" as "a quintessential 'do it on a computer' patent").

---

[3] "Automatic generation" of software code, without the *how*, is no more than the "[in]vocation of a wish list of functions, incorporating computer technology . . . .") *WalkMe Ltd.*, 2019 U.S. Dist. LEXIS 56640, at *20-21.

NOTICE OF MOTION AND MOTION OF WESTERN DIGITAL CORPORATION AND WESTERN DIGITAL TECHNOLOGIES, INC. TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES

63495690v4

### 3.    The Remaining Claims of the Asserted Patents Equally Lack an Inventive Concept

Beyond representative claim 19 of the '929 patent, none of the claims of the Asserted Patents recite an inventive concept, as summarized in the table below, which shows that, at most, they merely add insignificant "post-solution activity" involving "particular choices from within the range of existing content or hardware," and as such are insufficient to transform the claims into patentable subject matter. *Diamond v. Diehr*, 450 U.S. 175, 191–92 (1981); *Affinity Labs of Texas, LLC v. DIRECTV, LLC*, 838 F.3d at 1264.

| Claims | Features Lacking Inventive Concept |
|---|---|
| '929 pat., ind. cls. 1, 10, 24, 35, 44, 52, 58, 59, 67, 72 | *See supra* Section II.A. |
| '537 pat., ind. cls. 1, 15, 25, 34, 43 | *See supra* Section II.A.  The "deleting" step is a generic, routine function of a computer, and utilizes only generic, conventional computer components. The concept of operating only when the apparatus recognizes a device identifier is not inventive and is simply a routine comparison that can be performed by the human mind. |
| '581 pat., ind. cls. 1, 15, 29, 42 | *See supra* Section II.A. The "unique identifier" association is non-inventive as it is a generic, routine function of a computer, and utilizes only generic, conventional computer components, and no specific implementation is claimed. |
| '893 pat., ind. cls. 1, 12, 21, 32, | *See supra* Section II.B.  The functions of "reading", "identifying", "transferring", and "displaying" are all generic routine functions of a computer, and utilize only generic, conventional |

63495690v4

| Claims | Features Lacking Inventive Concept |
|---|---|
| | computer components. |
| '929 pat. cls. 2, 11, 29, 36, 45, 53, 60, 77; '537 pat. cls. 4, 5, 46–47; '581 pat. cls. 7, 21, 35; '893 pat. cls. 4, 15, 26, 37 | Limiting the information to compressed data or using particular, known formats, e.g., AAC, ATRAC, or MP3, for compressing. |
| '929 pat. cls. 3, 8–9, 12, 17, 18, 30, 33– 34, 37–38, 43, 46–47, 61, 66, 78–80; '537 pat. cls. 2, 44; '581 pat. cls. 8, 22, 36 | Providing that the external apparatus is portable or a portable audio player with a particular type of known storage medium, e.g., hard disk or flash memory, and in some claims, requiring the portable device to have less storage than the source server. |
| '537 pat. cls. 12, 22, 31, 40, 54; '581 pat. cls. 6, 20, 34; '893 pat. cls. 9, 20, 31, 42 | Providing that content already stored in both locations should not be transferred. |
| '929 pat. cls. 4, 13, 20, 25, 39, 48, 54, 62, 68, 73; '537 pat. cls. 3, 6, 45, 48; '581 pat. cls. 9-10, 23-24, 37-38; '893 pat. cls. 5, 16, 27, 38 | Adding known use of Tables of Contents ("TOC") and transferring information from these the TOC to the portable device, where the TOC includes data such as: titles, artist names, composer names, lyricist names, lyrics, and jacket images. |
| '929 pat. cls. 5, 14, 21, 26, 40, 49, 55, 63, 69, 74; '537 pat. cls. 9, 19, 28, 37, 51 | Adding known limitations that look for and evaluate device identifiers or associate playlists with devices using identifiers. |
| '929 pat. cls. 6–7, 15-16, 22–23, 27-28, 31–32, 41–42, 50–51, 56-57, 64–65, 70– 71, 75–76; '537 pat. cls. 7-8, 16-18, | Adding a display unit on the storage device for selecting and editing the list of data to transfer, and some claims adding that the user can edit the list via a touch sensor. |

NOTICE OF MOTION AND MOTION OF WESTERN DIGITAL CORPORATION AND WESTERN DIGITAL
TECHNOLOGIES, INC. TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES
63495690v4

| Claims | Features Lacking Inventive Concept |
|---|---|
| 26- 27, 35-36, 49-50; '581 pat. cls. 2, 4-5, 12, 16, 18-19, 26, 30, 32-33; | |
| '581 pat. cls. 3, 17, 31; '893 pat. cls. 6-7, 10-11, 17-18, 22-23, 28-29, 33, 39-40, 44-45 | Specifying that data is transferred when the two devices are connected. |
| '537 pat. cls. 10-11, 20-21, 29-30, 38-39, 52-53 | Adding limitations relating to managing the data lists, including: 1) selecting a list from a set of lists on the storage device; or 2) transferring the list along with the content data. |
| '893 pat. cls. 2-3, 8, 13-14, 19, 24-25, 30, 35-36, 41, 43 | Specifying that the transferring status is represented by a percentage of transfer or that the symbolic figure maybe rectangular or a circle. |
| '581 pat. cls. 13, 27, 40 | Providing that the communication apparatus may be wireless. |
| '537 pat. cls. 14, 25, 33, 42, 56; '581 pat. cls. 11, 25, 39 | Adding ripping content from CDs and compressing the content. |
| '537 pat. cls. 13, 23, 32, 41, 55; '581 pat. cls. 14, 28, 41 | Add a battery charger or charging feature. |

As this summary table makes clear, these additional limitations lack an inventive concept.  In the absence of inventive concepts, it is well settled that the inclusion of such features does not transform an otherwise ineligible abstract idea into patentable subject matter.

NOTICE OF MOTION AND MOTION OF WESTERN DIGITAL CORPORATION AND WESTERN DIGITAL TECHNOLOGIES, INC. TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES
63495690v4

## V.   **CONCLUSION**

For the foregoing reasons, Western Digital requests that the Court find the Asserted Patents invalid under 35 U.S.C. § 101 and grant its motion to dismiss in its entirety.


DATED:  April 5, 2019

JEFFER MANGELS BUTLER &
MITCHELL LLP
JOSEPH J. MELLEMA



By: _____/s/ Joseph J. Mellema_____
            JOSEPH J. MELLEMA
Attorneys for Defendants WESTERN
DIGITAL CORPORATION and
WESTERN DIGITAL TECHNOLOGIES,
INC.

63495690v4