RUSS, AUGUST & KABAT
Marc A. Fenster, SBN 181067
Email: mfenster@raklaw.com
Reza Mirzaie (CA SBN 246953)
Email: rmirzaie@raklaw.com
Brian D. Ledahl (CA SBN 186579)
Email: bledahl@raklaw.com
Paul Kroeger (CA SBN 229074)
Email: pkroeger@raklaw.com
C. Jay Chung (CA SBN 252794)
Email: jchung@raklaw.com
Philip X. Wang (CA SBN 262239)
Email: pwang@raklaw.com
12424 Wilshire Boulevard, 12th Floor
Los Angeles, California 90025
Telephone: (310) 826-7474
Facsimile: (310) 826-6991

*Attorneys for Plaintiff*
*Data Scape Limited*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DATA SCAPE LIMITED,<br><br>Plaintiff,<br><br>v.<br><br>WESTERN DIGITAL CORPORATION, WESTERN DIGITAL TECHNOLOGIES, INC.,<br><br>Defendants. | Case No. 8:18-cv-02285-DOC-KES<br><br>**DATA SCAPE'S OPPOSITION TO WESTERN DIGITAL'S MOTION TO DISMISS**<br><br>Date: May 6, 2019<br>Time: 8:30 AM<br>Ctrm: 9D<br><br>District Judge: Hon. David O. Carter |

## Table of Contents

Page(s)

I. INTRODUCTION ....................................................................... 1

II. APPLICABLE LEGAL STANDARDS UNDER RULE 12(B)(6).................. 2

III. DEFENDANTS CANNOT MEET THEIR BURDEN OF PROVING
PATENT-INELIGIBILITY .......................................................... 2

    A. The *Morohashi* Claims Are Patent-Eligible As a Matter of Law
Because They Are "Directed To" Unconventional Technological
Improvements to Technological Processes. ............................. 2

    B. The Hirano '893 Patent Is Eligible As A Matter of Law For the Same
Reasons.......................................................................................8

    C. Defendants' Arguments Under *Alice* Step 1 Rests On Numerous
Errors of Law and Fact ........................................................ 12

        1. Defendants' Motion is Based On a Flawed Attempt to
Lump Together Dozens of Claims from Four Patents *In
Unrelated Patent Families* Into A Single "Representative
Claim" .......................................................................... 12

        2. Regardless, Defendants' Argument Is Based On Another
Reversible Error: Overlooking Key Aspects of Each
Patent, Including the "Claimed Advance" ...................... 13

        3. Defendants Rely On Inapposite Cases And Ignore The
Critical Factual Distinctions Between Each of Those Cases
and This One ................................................................. 15

    D. Though it is Unnecessary to Move Beyond *Alice* Step 1 in this
Case, Defendants' Arguments in Step 2 Likewise Fail...................... 19

        1. Defendants' Refusal to Consider All Claim Elements as an
Ordered Combination Dooms Their Arguments on Step 2........ 19

        2. Defendants' Conclusory Characterization of the
Specifications Are Factually Wrong and, In Any Event,
Legally Irrelevant. ........................................................ 22

        3. Defendants' Catch-All Table Rests on Attorney Argument
And Cannot Be Nearly Enough to Satisfy Defendants'
Heavy Burden ............................................................... 24

IV. CONCLUSION .......................................................................24

## <u>**TABLE OF AUTHORITIES**</u>

<u>**Cases**</u>                                                                                              <u>**Page(s)**</u>

*Aatrix Software, Inc. v. Green Shades Software, Inc.,*
    882 F.3d 1121 (Fed. Cir. 2018)……………...…...…………22, 23, 24

*Affinity Labs of Texas, LLC v. Amazon.com., Inc.,*
    838 F.3d 1266 (Fed. Cir. 2016)…………………………………...17

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l,*
    134 S. Ct. 2347……………………………………………1-3, 6, 11, 19

*Amdocs (Israel) limited v. Opnet Telecom, Inc.,*
    841 F.3d 1288 (Fed. Cir. 2016)…………………………………6, 7, 13

*Ancora Techs., Inc. v. HTC Am., Inc.,*
    908 F.3d 1343 (Fed. Cir. 2018)………..……………………….2, 14, 15

*Ashcroft v. Iqbal,*
    556 U.S. 662, 679 (2009)…………………………………………….2

*Bell All. Corp. v. Twombly,*
    550 U.S. 544,555 (2007)…………………………………………….2

*Berkheimer v. HP Inc.,*
    881 F.3d 1360 (Fed. Cir. 2018)…………………………..12, 19, 21, 23

*Berkheimer v. HP, Inc.,*
    890 F.3d 1369 (Fed. Cir. 2018)…………………………………….20

*Burroughs Wellcome Co. v. Barr Labs., Inc.,*
    40 F.3d 1223 (Fed. Cir. 1994)……………………………………..12

*Comair Rotron, Inc. v. Nippon Densan Corp.,*
    49 F.3d 1535 (Fed. Cir. 1995)……………………………………..12

*Content Extraction & Transmission LLC, v. Wells Fargo Bank, Nat'l Ass'n.*
    776 F.3d 1343 (Fed. Cir. 2014)…………………………………….16

*DDR Holdings, LLC v. Hotels.com,*
    773 F.3d 1245 (Fed. Cir. 2014)…………………………………..13, 14

*Digitech Image Techs., LLC v. Electronics for Imaging, Inc.*,
    758 F.3d 1344 (Fed. Cir. 2014). )…………………………….…………18

*Finjan, Inc. v. Blue Coat Sys., Inc*.,
    879 F.3d 1299 (Fed. Cir. 2018).…………………………………2, 14

*Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*,
    896 F.2d 1542 (9th Cir. 1990)………………………………….………2

*In re TLI Commc'ns LLC Patent Litig*.,
    823 F.3d 607 (Fed. Cir. 2016) )……………………………….....…17

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
    519 F.3d 1025 (9th Cir. 2008)………………………………….………2

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
    132 S. Ct. 1289 (2012))………………………………………………19, 20

*McRO, Inc. v. Bandai Namco Games Am. Inc*.,
    837 F.3d 1299 (Fed. Cir. 2016)……………………………....…………3, 11, 13

*Papasan v. Allain,*
    478 U.S. 265 (1986) )……………………………….………………….2

*Proxyconn, Inc. v. Microsoft Corporation*,
    No. SA CV 16-1102-DOC-JPR, 2016 WL 9109110, at *2 (C.D. Cal. Sept. 29,
    2016)……………….……………………………………………....8, 18

*SAP Am. v. Investpic, LLC,*
    898 F.3d 1161 (Fed. Cir. 2018)………………………………………16

*Synchronoss Techs., Inc. v. Dropbox, Inc*.,
    226 F. Supp. 3d 1000 (N.D. Cal 2016)…………………………………11

*Secure Mail Sols. LLC v. Universal Wilde*, *Inc*.,
    873 F.3d 906 (Fed. Cir. 2017)………..………………………………...18

*Two-way Media Ltd. v. Comcast Cable Commc'n, LLC*,
    874 F.3d 1333 (Fed. Cir. 2017)………………………………………17

*Ultramercial*, *Inc. v. Hulu, LLC*,

772 F.3d 709 (Fed. Cir. 2014)……………………………………………19-21, 24

*Van Buskirk  v. Cable News Network, Inc.,*

284 F.3d 977 (9th Cir. 2002)……………………………………………..2

*Visual Memory LLC v. Nvidia Corp.,*

867 F.3d 1253 (Fed. Cir. 2017)……………….…………………….…7

**<u>Other Authorities</u>**

84 Fed. Reg. 50 (Jan.  7, 2019) ………………………………………………6

Federal Rule Civil Procedure 12(b)(6)…………………………………………2

## I.    __INTRODUCTION__

Defendants' Motion to Dismiss fails at every *Alice* step. Any reasonable review of the asserted claims demonstrates that, in their most basic form, they are directed to improved electronic systems configured to improve an existing electronic process, namely, the selective transfer or synchronization of digital data between two computer-storage media. Thus, they are patent-eligible as a matter of law.

Defendants' arguments otherwise rest on numerous reversible errors of law and fact. In *Alice* Step 1, Defendants wrongly attempt to meet their heavy burden by focusing their Motion on a single supposedly "representative claim" among dozens of asserted claims—*across four patents and two unrelated patent families*. To make matters worse, Defendants also wrongly premise their argument not on the focus of the claims "as a whole" or even the "claimed advance," as the Federal Circuit requires. Instead, Defendants' theories are premised on an overly simplified mischaracterization of the claims that fails to meet these requirements and, on the other hand, *ignores well over one hundred limitations* in their "representative" claim alone. Instead of dealing with any of the key facts, Defendants rely on inapposite cases. But unlike these cases, the asserted claims do not merely invoke computers as a tool to perform widely accepted abstract ideas.

Though this Court need not reach *Alice* Step 2, Defendants' legal and factual errors continue there. Incredibly, Defendants continue to fail to acknowledge many additional claim elements even in Step 2. For the others, they improperly dissect the claims into old and new elements and present mere attorney argument or conclusory statements alone. This cannot be sufficient to carry their burden, especially in light of the vast, contrary patent disclosures and claim-requirements. Though these failures of law and fact are clear on their face, at the very least, there are numerous factual questions under Step 2, which is also fatal to Defendants' Motion at this stage of the case. Accordingly, that Motion should be denied in its entirety.

1

## II.     APPLICABLE LEGAL STANDARDS UNDER RULE 12(B)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a complaint must be dismissed when a plaintiff's allegations fail to set forth a set of facts which, if true, would entitle the complainant to relief. *Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009); *Be11 All. Corp.  v. Twombly,* 550 U.S. 544, 555 (2007). The pleadings must raise the right to relief beyond the speculative level; a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555 (citing *Papasan v. Allain,* 478 U.S. 265,286 (1986)). On a motion to dismiss, courts accept as true a plaintiff's well-pleaded factual allegations and construe all factual inferences in the light most favorable to the plaintiff. *See Manzarek v. St. Paul Fire & Marine Ins. Co.,* 519 F.3d 1025, 1031 (9th Cir. 2008). Courts are not required to accept as true legal conclusions couched as factual allegations. *Iqbal,* 556 U.S. at 678. In evaluating a Rule l2(b)(6) motion, review is ordinarily limited to the contents of the complaint and materials properly submitted with the complaint. *Van Buskirk v. Cable News Network, Inc.,* 284 F.3d 977,980 (9th Cir. 2002); *Hal Roach Studios, Inc.  v. Richard Feiner & Co., Inc.,* 896 F.2d 1542, 1555 n.19 (9th Cir. 1990).

## III.    DEFENDANTS CANNOT MEET THEIR BURDEN OF PROVING PATENT-INELIGIBILITY

### A. The *Morohashi* Claims Are Patent-Eligible As a Matter of Law Because They Are "Directed To" Unconventional Technological Improvements to Technological Processes

Under Step 1 of the *Alice* inquiry, courts must ask "whether the claims, as a whole, is 'directed to' [] an abstract idea." *Ancora Techs., Inc. v. HTC Am., Inc*., 908 F.3d 1343, 1347 (Fed. Cir. 2018). To determine what the claims are "directed to," courts must, at the very least, examine each patent's "claimed advance." *Id*. (citing *Finjan, Inc. v. Blue Coat Sys., Inc*., 879 F.3d 1299, 1303 (Fed. Cir. 2018). In so doing,

courts "'must be careful to avoid oversimplifying the claims' by looking at them generally and failing to account for the specific requirements" of different claims. *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016). This is because at "some level, 'all inventions … embody use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.'" *Alice* 134 S. Ct at 2354.

Any reasonable review of the claims of the three *Morohashi* patents-in-suit demonstrates that—even ignoring many claim limitations—in their most basic form, they are "directed to:"

- A data synchronization system with a controller configured to selectively transmit certain digital data between first and second storage media based on a comparison of edited data management information stored in the storage medium (**'929 patent**);

- A data synchronization system with a controller configured to compare identifiers in first and second apparatuses and thereby selectively delete and transfer certain digital content data across the two apparatuses (**'537 patent**); and

- A data synchronization system with a controller configured to uniquely associate an edited digital data list with an external apparatus using a unique identification of that external apparatus and selectively transfer certain digital content data registered in that list (**'581 patent**).

Under controlling law, none of these ideas is abstract. To the contrary, the ideas are directed to improved electronic systems—reciting computer controllers and other concrete components and circuitry—that are configured to improve an existing electronic process, namely, the selective transfer or synchronization of certain digital data between two computer storage media. Thus, they are patent-eligible as a matter of law. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2358 (claims that "improve[] an existing technological process" or "solve a technological problem in 'conventional industry practice'" are patent-eligible as a matter of law).

The intrinsic record of different *Morohashi* patents-in-suit further bolster this inevitable conclusion. In fact, they make clear the claims must be electronic-specific

solutions aimed at improving technological processes and tackling technological shortcomings ***that can only exist in the electronic realm***; namely, selectively edit and transfer only certain identified digital data—and only to certain connected computer-storage media. And they accomplished this feat by conceiving—in 1999 and 2002—various technical solutions that involved various systems and methods that employed a "controller" or other computer circuitry to use and compare in the digital space what they referred to as "management" data and "identifiers."

As the *Morohashi* patents expressly state, the inventors at Sony aimed to solve the problems skilled artisans in 1999 faced trying to selectively transfer digital data between two electronic apparatuses. *E.g.*, '929 Patent, Col 2:1-39. For example, the "conventional" electronic systems used by skilled artisans at the time of the invention were computer systems with an optical disk-changer to accomplish this process. *Id.* at 10-29. But with the then-recent explosion of massive digital-data transfer on the order of *gigabytes*, the existing electronic processes did not enable easy or random selection of files to transfer. *Id.* When someone used computer systems that burned digital files into hard disk drives or semiconductor memory, those systems still required a large amount of time to selectively transfer certain digital data between electronic apparatuses. *Id.* And in any case, there was no reasonable way to selectively synchronize select digital content data between the apparatuses. *Id.* These *problems* were *specific to* the technological, electronic process of selective digital-data transfer between electronic apparatuses. *Id.* at 1:27-2:22. And the inventor expressly stated that he did not want to resort to merely changing aspects of the existing electronic processes to make them require more manual user-interactions, because that would be "cumbersome" and create "confusion." *Id.* at 2:10-39.

With thirteen hardware and software figures and twenty-eight columns of explanatory textual disclosure, including Figure 2 below, the inventor taught technical solutions involving a *novel and unconventional* computer system with a controller configured with circuitry to compare and otherwise make use of certain control data he called "management" information:



Enabled by these teachings, the patents *recite in their claims* various unconventional technical solutions to the existing technological problems and shortcomings. For example, various claims require the then-unconventional system of electronic components configured to use certain digital "management information" to compare, edit, delete and selectively transfer separate digital content data between two identified electronic apparatuses. *See,* '929 Patent Claim 1. For example, Claim 1 of the '929 Patent recites a distributed system with computer components, including:

- [a] a ***second storage medium*** configured to store management information of data to be transferred to said ***first storage medium***;

- [b] *a **communicator*** configured to communicate data with said first apparatus;

- [c] a ***detector*** configured ***to detect whether said first apparatus and said second apparatus are connected***;

- [d] <u>***an editor configured to select certain data [] and to edit said management information based on said selection, without regard to the connection***</u>… and

- [e] <u>***a controller configured to***</u>:

5

- o [i] ***control transfer of the selected data*** stored in said second apparatus to said first apparatus ***via said communicator based on said management information*** edited by said editor when said detector detects that said first apparatus and said second apparatus are connected**;**

- o [ii] *compare said management information…with management information [] in said first storage medium* and

- o [iii] *to transmit data [] based on [the] comparison*."

'929 Patent Claim 1 (emphasis added).

Unlike Defendants' cited cases, the claims plainly do not fall within any of the categories "identified by the courts as abstract ideas," that recently have been synthesized into three groups: "(a) mathematical concepts"; "(b) methods of organizing human activity"; or "(c) mental processes." 84 Fed. Reg. 50 (Jan. 7, 2019) (2019 PTO §101 Guidance, citing and surveying post-*Alice* decisions). And they do not merely recite computer components to perform an "abstract idea." They recite *technological* solutions to problems that were specific and unique to the *technological* realm of selective editing and/or transfer of digital data. They are, therefore, patent-eligible as a matter of law. *Alice*, 134 S. Ct. at 2358.

Indeed, even acknowledging ***only*** the underlined claim elements—which were those noted in the prosecution history to ***advance*** the independent claims over the existing prior art in 1999—the claims here are analogous to claims determined to be patent-eligible by the Federal Circuit. For instance, in *Amdocs (Israel) Limited v. Opnet Telecom, Inc.,* the Federal Circuit held that a strikingly similar claim, which had significantly fewer limitations, was not abstract and, therefore, patent-eligible. 841 F.3d 1288 (Fed. Cir. 2016). In that case, the Federal Circuit held as patent-eligible the following claim in a patent for an improved system for receiving and correlating "accounting records" between a first source and a second source using "the accounting information available from a second source:"

- "code for"

  o [a] "***receiving from a first source a first network accounting record,***"

  o [b] "***correlating the network accounting record with accounting information available from a second source***," and

  o [c] "***using the accounting information*** with which the first network accounting record is correlated ***to enhance the first network accounting record***".

*Id*. at 1299-1300. In reversing the district court's ineligibility decision, the Federal Circuit held the claim was eligible as a matter of law because, though it pertained to "accounting records," it nevertheless "entails an unconventional technological solution (enhancing data in a distributed fashion) to a technological problem (massive record flows which previously required massive databases)." *Id*. at 1300-01. The court further noted that even though the "solution requires arguably generic components, including network devices and gatherers' which gather information," the claims nevertheless were eligible because, in light of the specification, they recited using those components in an unconventional manner. *Id*.

As shown above, the asserted *Morohashi* claims here are striking similar, only they are directed squarely to the more widely accepted technological problem of selective digital-data transfer. And the claims recite solutions aimed to improve an electronic system—and likewise require a controller to compare "management information"—but also recite *many more limitations* than those in *Amdocs*.

Other Federal Circuit cases also confirm the eligibility of these claims. For example, in *Visual Memory LLC v. Nvidia Corp*., the Federal Circuit reversed a district court finding of ineligibility of a patent on an electronic system for determining a type of data stored in a cache memory using another memory medium and an "operational characteristic." 867 F.3d 1253, 1257-61 (Fed. Cir. 2017). The court held that, despite the small number of claim requirements, which may or may

not present other invalidity issues not before the court, the claims were patent-eligible because they focused on a "'specific asserted improvement in computer capabilities'—the use of programmable operational characteristics that are configurable based on the type of processor." *Id*. at 1259-60.

This Court's precedent is highly instructive to this particular case as well. In *Proxyconn, Inc. v. Microsoft Corporation*, this Court analyzed claims that were also aimed at the selective transfer of data to reduce computer storage, transfer and time burdens. *Proxyconn, Inc. v. Microsoft Corp.*, No. SA CV 16-1102-DOC-JPR, 2016 WL 9109110, at *2 (C.D. Cal. Sept. 29, 2016). And like the "management" or "identifier" information employed in the claims here, the *Proxyconn* claims used a "digital digest." *Id*. at *1-2. And like the requirements to compare management information and/or use other control identifiers here, the *Proxyconn* claims further included a set of rules "tailored to the data access and storage context," and "not general mathematical principles[.]" *Id*. at *5. This "ma[de] them the proper province of patent protection." *Id*. So too are Data Scape's patent claims.

## B. The Hirano '893 Patent Is Eligible As A Matter of Law For the Same Reasons

Like the separate *Morohashi* patent family, the *Hirano* ("'893 patent") claims—in their most basic form—are even more limited. They are "directed to:"

- A data synchronization system with circuitry configured to use management data to automatically identify specific digital source data in a first computer storage that is absent on a second computer storage—and automatically transfer that data to the second storage medium while automatically outputting its digital transfer status. (**'893 Patent**)

The *Hirano* patents, conceived by a team of different inventors a little more than two years later, in 2002, are directed to even narrower electronic solutions to existing electronic processes. The '893 patent inventors aimed to avoid expending the vast amounts of digital computer-storage space and time that skilled artisans encountered when transferring duplicate digital files using CDs and hard disk drives on existing

electronics apparatuses. '893 Patent, Col. 1:34-2:59 (describing one existing "drawback" as the "hard disk [space] consumed in vain" and "[a]nother drawback" caused by "duplication … and recording on [] hard disk" in which "time is prolonged in vain."). Nevertheless, the inventors made clear they wanted to improve the existing electronic processes, rather than inconvenience computer users. Indeed, they stated that changing the existing (albeit, problematic) computer processes to merely demand that a user perform a "checking" operation ***was not an option***. *Id*. ("a personal computer is usable, but the user must still perform a[n] operation particular for checking and ease of use is not provided").

Instead, Hirano and his co-inventors aimed to improve the existing electronic processes. And with their entirely different set of nineteen hardware and software-related figures and *thirty-eight* columns of explanatory text, the *Hirano* inventors also presented electronic-specific solutions to an electronic-specific problem. Figure 1 illustrates an exemplary embodiment:



And to further enable its express aim of achieving automated, electronic synchronization of certain de-duplicate digital-data files, the patent teaches exemplary data frame and block structures, and "sub-coding," which, as the patents make clear, is unique to the digital realm:



As with the *Morohashi* patents, the '893 *Hirano* patent likewise *recites in its claims* solutions aimed to improve the automatic transfer of only specific, de-duplicate digital files not already residing on a second computer storage medium. '893 patent, Claims 1-45. And they further enable the electronic output of a real-time status of that transfer. *Id*. For example, Claim 32 recites:

- "***circuitry configured*** to:

  - [a] ***automatically read first management data from a first storage medium***, the first management data identifying files of source data recorded on the first storage medium,

  - [b] ***automatically identifying one of the files of source data based on the first management data and second management data***, the second management data ***identifying files of transferred data stored on a second storage medium, the one of***

***the files of source data being absent from the second source medium*,**

- [c] ***automatically transfer the one of the files of source data to the second storage medium,*** the one of the files of the source data being transferred becoming one of the files of transferred data, and

- [d] ***automatically output transferring status*** *of the one of the files of source data* by a symbolic figure."

'893 patent, Claim 32 (emphasis added).

The *Hirano* claims also do not fall within any of the categories identified by the courts as abstract ideas. They recite *technical* solutions to the existing *technical* problems and, thus, are patent-eligible as a matter of law. *Alice*, 134 S. Ct. at 2358.

And again, when just accounting for the key limitations, they are analogous to claims determined to be patent-eligible by the Federal Circuit. For instance, in *Core Wireless v. LG Elecs.*, the court held that the claims were eligible under Step 1 because they provided an improved solution to the technical problem of collecting, summarizing and displaying data on a user interface, even though "the generic idea of summarizing information certainly existed prior to the invention. 880 F.3d 1356, 1362 (Fed. Cir. 2018). Likewise, in *McRo, Inc. v. Bandai Namco Games Am., Inc.,* the court held a patent eligible under Steps 1 and 2 where it was expressly directed to "automating" the animation of lip synchronization. 837 F.3d 1299, 1299-1313 (Fed. Cir. 2016). And in a district court case that is even more factually analogous, the Northern District of California held that claims that were directed to "more efficient mechanism for ***synchronizing data between systems*** connected to a network ***by updating only the changed data rather than recopying all information***" were patent-eligible as a matter of law. *Synchronoss Techs., Inc. v. Dropbox, Inc.*, 226 F. Supp. 3d 1000, 1007-08 (N.D. Cal 2016). That was because, just like the claimed subject matter and patent disclosures here, the claim is "directed to an improvement in computer capabilities." *Id.* Defendants arguments should be rejected.

11

**C. <u>Defendants' Arguments Under *Alice* Step 1 Rests On Numerous Errors of Law and Fact</u>**

**1. Defendants' Motion is Based On a Flawed Attempt to Lump Together Dozens of Claims from Four Patents *In Unrelated Patent Families* Into A Single "Representative Claim"**

In their first flawed attempt to oversimplify the inventions and issues for this Court to decide, Defendants present their Step 1 arguments on dozens of asserted claims—***across two unrelated patent families***—to focus on a single "representative" independent claim (Claim 1) of the '929 Patent. Mot. at 10-11. But the Federal Circuit very recently clarified that a "claim is ***not*** representative simply because it is an independent claim" and, regardless, it is error to use a "representative" claim in any eligibility determination if there is "***any meaningful argument***" not to. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365-66 (Fed. Cir. 2018) (emphasis added).

Though Defendants' premise that Claim 1 of the '929 Patent is "representative" of all asserted claims is based on flawed and inaccurate conclusory statements, this case includes textbook examples of additional "meaningful argument[s]" why it is wrong to boil down the entire case to one claim. Indeed, even with respect to patents in the same patent family, the "separate patents describe 'separate and distinct [inventions],' 35 U.S.C. § 121 . . . and it cannot be presumed that related patents rise and fall together." *Comair Rotron, Inc. v. Nippon Densan Corp.*, 49 F.3d 1535, 1539 (Fed. Cir. 1995); *see also Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1231-32 (Fed. Cir. 1994) ("even though all six patents arise from the same parent application, each patent claims a different invention"). But there are additional "arguments" here: the patents in fact have different claimed solutions across four patents *in two unrelated patent families* with wholly non-overlapping specifications. *See supra* § III.A & B.

One comparison between the *Morohashi* patent family and the *Hirano* patent family makes this point clear. While the *Morohashi* family, on the one hand, includes

thirteen figures and twenty-eight columns of enabling disclosure, the *Hirano* family (which has entirely different inventors) includes an *entirely different* set of nineteen figures and thirty-eight columns of *entirely different* disclosure. *Compare '929 patent with* '893 patent. And even a cursory review of the independent claims, much less their dependents, prove there is significant non-overlap in claim elements in the *Morohashi* patent family alone—and very little overlap at all between that family and the claims of the *Hirano* '893 patent. This Court can deny Defendants' faulty motion for this reason alone.

### 2. Regardless, Defendants' Argument Is Based On Another Reversible Error: Overlooking Key Aspects of Each Patent, Including the "Claimed Advance"

Defendants' Motion adds a second flawed premise right after their first one. This time, Defendants further base their entire Step 1 argument on the premise that all of the dozens of asserted claims across the two unrelated patent families have the exact same idea or "thrust" or "focus," namely, "transferring specified data from one storage location to another." Mot. at 12-13. Defendants' premise is demonstrably incorrect as a matter of law and fact.

*First*, Defendants' single summary of the claimed focus of dozens of claims improperly "oversimplif[y] the claims' by looking at them generally and failing to account for the specific requirements" of different claims. *McRO, Inc.*, 837 F.3d at 1313; *see also Amdocs*, 841 F.3d at 1299 (reversing district court because it failed to acknowledge key elements of the claim in Step 1). For example, to argue that the claims were directed to abstract ideas, the defendant in *DDR Holdings* omitted key concepts and inaccurately summarized the patented invention as "making two web pages look the same." *DDR Holdings,* 773 F.3d at 1255-59. The Federal Circuit rejected that bare description. *Id*. Instead, the court held that the claims were directed to "methods of generating a composite web page that combines certain visual elements of a 'host' website with content of a third-party merchant." *Id*. at 1248.

1    Under the correct characterization, the court held that the claims were patent eligible.

2    *Id*. at 1259.

3        As in *DDR Holdings* and other cases, Defendants here provide oversimplified

4    and incorrect characterizations of the patented claims, a replay of the unsuccessful

5    strategy used by the *DDR Holdings* defendant. Indeed, Defendants'

6    oversimplification is far worse: their sweeping **nine-word oversimplification ignores**

7    **one hundred and seventy-three elements** in Claim 1 of the '929—and obviously fails

8    to account for meaningful differences between that claimed solution and all the others.

9    That is in clear violation of controlling precedent, which acknowledges the simple

10   truth that on "some level, 'all inventions … embody use, reflect, rest upon, or apply

11   laws of nature, natural phenomena, or abstract ideas.'" *Alice* 134 S. Ct at 2354.

12       *Second*, while a summary of the claimed ideas under *Alice* Step 1 may omit

13   some claimed details, Defendants' sweeping "summary" disregards the exact details

14   the law forbids us to omit. the Federal Circuit has mandated that courts must ask

15   "whether the claims, **as a whole**, is 'directed to' [] an abstract idea." *Ancora Techs.*,

16   908 F.3d at 1347 (emphasis added). And to determine what the claims are "directed

17   to," courts must examine the intrinsic record and include, at the very least, each

18   patent's "**claimed advance**." *Id*. (citing *Finjan, Inc. v. Blue Coat Sys., Inc*., 879 F.3d

19   1299, 1303 (Fed. Cir. 2018)) (emphasis added).

20       But here, Defendants' single proposed "focus" (across the dozens of asserted

21   claims) fails to even include the "claimed advance," let alone view each patent claim

22   as a whole. A review of the claims and other intrinsic evidence demonstrates that,

23   according to the patentee and the examiner, the "claimed advance" of even Claim 1

24   of the '929 included these emphasized elements:

25   • [d] ***an editor configured to select certain data [] and to edit said***

26       ***management information based on said selection, without regard to***
     ***the connection***… and

27

28   • [e] ***a controller configured to…***

14

- [ii] *__compare said management information…with management information [] in said first storage medium__* and

- [iii] *__to transmit data [] based on [the] comparison__*."

*See, e.g.,* Ex. 1 ('929 FH) at Page 299-303 of 379 (June 29, 2009 Amendment) (applicant indicating that "edit[ing] management information … without regard to connection" is inventive over prior art); *id.* at Page 367 of 379 (Sept 17, 2009 Amendment) (indicating that examiner agreed that "comparing management information" would overcome examiner's rejections). Defendants' failure to include these most basic elements in the claimed advance makes their entire Step 1 argument flawed as a matter of law. *Ancora Techs*, 908 F.3d at 1347.

*Third*, while Defendants' misdirection from the *claims* and focus on random snippets from the *specifications* runs afoul of precedent requiring litigants to examine the "claims, as a whole," the snippets also do not help them. Mot. at 12-13. Instead, the specification only confirms that Defendants' sweeping approach is wrong—and that each patent provides unconventional electronic technological improvements to existing electronic processes. *E.g.*, *supra* at § III.A & B.

In view of these critical errors in law and fact, Defendants cannot carry their heavy burden on Step 1. And, therefore, their motion to dismiss fails in its entirety.

### 3. Defendants Rely On Inapposite Cases And Ignore The Critical Factual Distinctions Between Each of Those Cases and This One

Instead of acknowledging or dealing with any of the key intrinsic facts, Defendants instead rely on many factually distinguishable cases. While large in number, Defendants' cases are inapposite—and Defendants' arguments for why they are analogous wholly fail on substance. As an initial matter, Defendants' reliance and arguments are premised on Defendants' fatally flawed oversimplification of the asserted claims here, which ignores all of the "claimed advances"—and strips away the one hundred seventy-three claim requirements and the entire nature of the patents

along with it. And in any event, they miss the key distinctions between even facially similar cases with ineligible patent claims and those with eligible claims under Step 1. Unlike the cases Defendants cite, the asserted claims here are not merely invoking computers as a tool to accomplish systems or methods that are "directed to" abstract ideas. Instead, they are directed to unconventional technological solutions to the technological processes and systems and processes that existed at the time of the inventions. *See supra* § III.A, B, C.2.

Defendants' leadoff cases—*Content Extraction* and *SAP America*—only reveal the fatal flaws in their Step 1 analysis. Those two inapposite cases involve patents that are expressly aimed toward ideas that focus on *commercial or economic* activity long held to involve abstract ideas—and merely using a computer to process that activity.

For example, in *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n,* the patents at issue were part of a family which taught methods that "can be performed by software on an automated teller machine (ATM) that recognizes financial information written on a scanned check, such as the check's amount" and other financial information that can be read by the naked eye. 776 F.3d 1343, 1345-47 (Fed. Cir. 2014). And beyond this undisputed fact, the claims were drawn to collecting data, recognizing certain data sets and storing those data sets—offering no specific feature or way to accomplish those goals. *Id*. Thus, after filing suit against banks and other financial services, the Federal Circuit followed a long line of cases and unsurprisingly held that the claims were directed to abstract ideas, which are no less abstract just because you use a computer or machine to perform them. *Id*. Similarly, the claim in *SAP Am. v. Investpic, LLC* also involved abstract financial activity. And unlike the claims here, it expressly aimed to avoid "understat[ing] the true risk and oversta[ing the] potential rewards for an investment or trading strategy." 898 F.3d 1161, 1164-65 (Fed. Cir. 2018). From there, the claims merely recited mathematical concepts to generate financial information to achieve these long-established abstract goals. *Id*. Indeed, the method claim involved merely (a) "selecting

16

a sample space [that] includes at least one investment data sample;" (b) "generating a distribution function using a resampled statistical method and bias parameter …" and (c) "generating a plot of the distribution function." *Id*.

Defendants' leading "analogous" cases are critically different from the present case, which is directed to improving the existing processes of selective digital-data transfer and which further provides specific technological-based ways—using computer controller using management data and identifier—to achieve that improvement.

Defendants' follow-on cases fare no better and are inapposite under Step 1 for similar reasons. Setting aside Defendants' extremely high-level cropped quotes and forced analogies, a review of the record confirms that claims are markedly different than those asserted here. For example, in *Affinity Labs of Texas, LLC v. Amazon.com., Inc.,* though the patent claim snippets appear on their face to suggest a computer-data focus, a more thorough review of the intrinsic record confirmed they were not. Both the specification and the admittedly representative claim was not; it was directed to the mainly geography-related, service-subscription problem of transferring "regional broadcast signals to cellular telephones located outside the region." 838 F.3d 1266, 1267-69 (Fed. Cir. 2016). Thus, the Federal Circuit held that the claims were directed to the ineligible "concept of providing out-of-region access to regional broadcast content." *Id*. And unlike the claimed "controller" elements of the *Morohashi* patents or the claimed "circuitry" elements of the *Hirano* patent here, Affinity's claim did not include any specificity on how any components achieved its abstract goal. *Id*. *Two-way Media Ltd. v. Comcast Cable Commc'n, LLC* was very similar and also involved admittedly representative claims directed to generically "directing" sent information, "monitoring" a receipt of that information, and "accumulating" the receipts. 874 F.3d 1333, 1337-38 (Fed. Cir. 2017). And like *Affinity Labs*, the claims did not include any specificity on how any components achieved its abstract goal. *Id*. Similarly, in *In TLI Commc'ns LLC Patent Litig.*, the claims stood in stark contrast to those asserted here.

17

They were directed to using a generic "telephone" and a purely conventional server to merely classify an image and store it based on that classification. 823 F.3d 607, 612 (Fed. Cir. 2016). And beyond defective claims, the specification was also defective. It did not "describe a new telephone, a new server, or a new physical combination of the two," but instead, only described the systems in purely functional terms. *Id.*

Defendants' remaining "analogous" Federal Circuit cases are likewise inapposite. *Secure Mail Sols. LLC v. Universal Wilde*, *Inc.*, involved non-electronic "mail barcode" patents. 873 F.3d 906-08 (Fed. Cir. 2017). While the claims did recite "storing" and receiving" certain mail data, the patent was expressly aimed at the abstract human activity of allowing an old-school mail sender to provide personalized data directly to the mail recipient, without the involvement of the mail carrier. *Id.* And *Digitech Image Techs., LLC v. Electronics for Imaging, Inc.*, also involved the abstract human activity of "organizing information through mathematical correlations." 758 F.3d 1344. And as this Court previously recognized, the claims were virtually unlimited in that they "encompass[ed] all embodiments of the information contained in [a] device profile … regardless of the process through which the information is obtained[.]" *Id.*

If anything, Defendants' sweeping legal assertions only reveal their pervasive failure to apply the correct legal analysis to computer-implemented claims. As this Court recognized in *Proxyconn*, this analysis is necessary to separate the ineligible claims from eligible ones like those asserted here. As in *Proxyconn*, Defendants' cases are distinguishable because they involve claims that are directed only "generally at data storage or collection outside of the context of any special method" or any improvement to a fundamental electronic "processing function." *Proxyconn*, 2016 WL 9109110, at *6. Defendants' refusal to deal with these critical legal or factual nuances is fatal to their motion.

Left with little else, Defendants end their Step 1 section with a purely conclusory one-sentence argument the claims here "are drawn so broadly—

encompassing any type of device for transferring any type of data—that they impermissibly preempt all applications of this abstract idea." Mot. at 16. But the one hundred and seventy-three claim requirements Defendants ignore clearly prove otherwise. They provide meaningful limitations; they make clear that even many selective digital-data transfer systems would not and could not infringe. To name just a few examples, selective digital-data transfer systems that merely transfer, backup and save all data from a location in one storage device to another would not infringe; neither would a digital-data transfer system that did not include the specific claimed "controller;" or one that did not have circuitry to "compare[] management" information or identifiers in electronic apparatuses.

In sum, Defendants' theories under *Alice* Step 1 are legally and factually baseless. Applying the correct legal principles to this case, the asserted claims are patent-eligible as a matter of law—and this Court need not move on to Step 2.

### D. **Though it is Unnecessary to Move Beyond *Alice* Step 1 in this Case, Defendants' Arguments in Step 2 Likewise Fail**

#### 1. **Defendants' Refusal to Consider All Claim Elements as an Ordered Combination Dooms Their Arguments on Step 2**

The Supreme Court and Federal Circuit have provided significant guidance for the rules to apply in Step 2 of the *Alice* inquiry. At this stage, Defendants bear the burden of proving that all facts, read in a light most favorable to the patentee, show only that all additional elements of the patented inventions—taken individually or together as an ordered combination—do not comprise "well-understood, routine, conventional activity." *Ultramercial*, 772 F.3d at 715 (*quoting Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1298 (2012)). Critically, "***it is inappropriate to dissect the claims into old and new elements*** and then to ignore the presence of the old elements in the analysis." *Ultramercial*, 722 F.3d at 1344 (emphasis added). In any event, an accused infringer ***cannot*** satisfy its burden with

mere attorney argument or "conclusory" statements alone. *Berkheimer v. HP, Inc.*, 890 F.3d 1369, 1372-73 (Fed. Cir. 2018) (denying petition for rehearing *en banc*).

Defendants argue that the "asserted patents claim only generic computer functions using conventional components." Mot. at 17-19. But their arguments impermissibly ignore each of the controlling legal rules they must apply or else pay mere lip service to (and runs afoul of) them.

*First*, in broadly asserting under Step 2 that the dozens of asserted claims of the "asserted patents claim only generic computer functions using conventional components" Defendants incredibly continue to ***ignore the majority of claims and claim elements***. Mot. at 17-19. But the Supreme Court and Federal Circuit forbid accused infringers from doing just that. *Ultramercial*, 772 F.3d at 715 (*quoting Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1298 (2012)). Here, Defendants cite only a small handful of claim elements from the one hundred seventy-three '929-patent elements they side-stepped in Step 1—and continue to disregard the other patents, patent families and claim elements. Mot. at 18 (identifying "editing" "detecting," and "transmitting."). Ignoring *far* fewer elements has still led to reversible error under Step 2. *E.g., Berkheimer v. HP.,* 881 F.3d 1360, 1368-71 (holding that district court's failure to properly consider elements of claims 4-7 of single patent was reversible error).

*Second*, for the claim elements Defendants actually do acknowledge, they do nothing more than make purely conclusory attorney argument, with almost no citations to the record. Mot. at 17-19. In fact, this entire section of Defendants' motion—intended to cover dozens of claims of four patents across sixty-five combined columns of patent disclosure in two patent families—includes ***only two citations to the record***, supposedly corresponding to the relevant disclosure of the "detecting" and "editing" elements. *See* Mot. at 18 (citing patent at columns 26 and 31 only). They continue to wholly ignore many objectively key limitations, including the concrete—and pervasive—requirement of "*a controller configured to...compare*

*said management information…with management information [] in said first storage medium* and *… to transmit data [] based on [the] comparison*." They also ignore very large swaths of additional claim elements as an ordered combination—and also ignore their corresponding patent disclosures. This is fatal to their motion. *Berkheimer*, 890 F.3d at 1372-73. It is also telling: because numerous pieces of the patent disclosure and claims themselves prove Defendants wrong and conclusively show the patent claims are patent-eligible technological solutions under Step 1 and also contain inventive ordered combinations at Step 2. *E.g.*, '929 patent claims; Figures 1, 12A, 12B; col 1:15-col. 2:39; sol. 7:5-8:24; 9:31-10:53; 11:37-12:15; 23:15-26:43; *see also* '893 patent claims; Figs. 1, 16, 17A, 17B, col 1:41-2:59; 7:35-8:2; 9;4-10:2; 13:14-15:14; 23:48-26:6329:1-30:45.

*Third*, Defendants are committing a separate legal flaw in their analysis even for the two '929 patent "detecting" and "editing" claim elements for which Defendants provide *some* factual citation. In singling out only a few words from two claim elements and ignoring their role in the complete, ordered combination, Defendants are improperly "dissect[ing] the claims into old and new elements and then to ignore the presence of the old elements in the analysis." *Ultramercial*, 722 F.3d at 1344 (emphasis added). And regardless, Defendants' citations do not help them. They do not prove that even the individual elements themselves comprise "well-understood, routine, conventional activity," let alone the ordered combination of all elements. Moreover, Defendants' table *still* includes mere attorney argument or conclusory statements. That makes it legally insufficient to carry their burden. *Berkheimer,* 890 F.3d at 1372-73. Even that single conclusory statement on one element might, at most, tend to show the singled-out element might merely be "known" does not answer the relevant question under Step 2. That is because the "mere fact that something is disclosed in [] prior art … ***does not mean*** it was well-understood, routine, and conventional." *Id* (emphasis added). And here, the patents and their file histories make clear that each included independent-claim limitations

that were not in the prior art, let alone "well-understood, routine, and conventional." This includes the claimed (1) "controller," (2) "editor," and the claimed circuitry to (3) "compare [] management information," or (4) "uniquely associate" with an external hardware apparatus. And the dependent claims include similar questions. Beyond just the "representative" '929 patent, this includes, at least claims 3, 6 and 12 of the '537 patent, claims 2, 3, and 14 of the '581 patent, and claims 4, 6, 8 and 41 of the '893 patent, to name just a few.

Though these fatal facts are clear from the record, at the very least, under the proper Rule 12(b)(6) standards, even a conflicting intrinsic record would present a factual dispute that precludes a motion to dismiss. *See, e.g., Aatrix Software Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125-30 (Fed. Cir. 2018).

The International Trade Commission recently instituted an infringement investigation and rejected the accused infringer's attempt at an early 101 determination. Ex. 2.

### 2. Defendants' Conclusory Characterization of the Specifications Are Factually Wrong and, In Any Event, Legally Irrelevant

Defendants move next to ignoring or mischaracterizing the patent specification. Mot. at 19-20. They apparently do this in an attempt to prove that the "claimed functions were routine" and merely "automate a manual process." *Id*. This also fails.

In fact, Defendants' contention that the patents merely automate a manual process in the existing art is belied by the facts expressed in the patents themselves. As previously demonstrated, the "conventional" electronic systems used by skilled artisans at the time of the invention was a computer system with optical disk-changer to accomplish this process. *Id*. at 10-29. But with the then-recent explosion of massive digital-data transfer on the order of *gigabytes*, the existing electronic processes did not enable easy or random selection of files to transfer. *Id*. When some uses computer systems that burned digital files into hard disk drives or semiconductor memory, those still required a very long time to selectively transfer certain digital data between

electronic apparatuses. *Id*. For their part, the inventors expressly stated that they ***did not*** want to resort to merely changing aspects of the existing electronic processes to make them require more manual user-interactions, because that would be more "cumbersome" and create "confusion" in determining its purpose. *Id*.

Moreover, when examining the actual, complete record, the patents clearly describe unconventional servers and automatic electronic apparatuses and processes that aim to reduce data redundancies, improve system efficiency, reduce digital-data storage and time requirements, among other things. *See also id.* at 2: 10-39; *E.g.*, '929 patent claims; Figures 1, 12A, 12B; col 1:15-col. 2:39; sol. 7:5-8:24; 9:31-10:53; 11:37-12:15; 23:15-26:43; *see also* '893 patent claims; Figs. 1, 16, 17A, 17B, col 1:41-2:59; 7:35-8:2; 9;4-10:2; 13:14-15:14; 23:48-26:6329:1-30:45. These exact concepts have been determined sufficient in other cases involving patents with *later* priority dates. *Berkheimer*, 881 F.3d at 1369 ("The specification describes an ***inventive*** feature that stores parsed data in a purportedly unconventional manner. This eliminates redundancies, improves system efficiency, reduces storage requirements, and enables a single edit to a stored object to propagate throughout all documents linked to that object."). Again, these dispositive facts are clear in the record; but at the very least, under the proper Rule 12(b)(6) standards, even a conflicting intrinsic record would present a factual dispute that precludes a motion to dismiss. *See, e.g., Aatrix Software,* 882 F.3d at 1125-30.

To be sure, Defendants are also wrong about the legal import of their factually baseless theory in any event. While Defendants contend that it is "well settled" that "automating an otherwise manual" tasks is not inventive, the Federal Circuit disagrees. In *McRO,* held a patent eligible under Steps 1 and 2 where it was expressly directed to "automating part of a preexisting 3-D animation" task. 837 F.3d at 1299-1313; *see also id*. ("***essentially, the patents aim to automate a 3-D animator's tasks***…") (emphasis added). Indeed, even Defendants in that cases "did not dispute that automat[ing] tasks that humans are capable of performing are patent eligible if

23

properly claimed." *Id*. at 1313. Thus, even if Defendants are correct about their assertion, it would not help them carry their burden here anyway, because it (again) also rests on an incorrect legal premise.

### 3. Defendants' Catch-All Table Rests on Attorney Argument And Cannot Be Nearly Enough to Satisfy Defendants' Heavy Burden

In a failed effort to cover their bases, Defendants insert a three-page word table that, they purport, adequately covers the elements of "the remaining claims[.]" Mot. at 21-23. But Defendants' table does no such thing. To the contrary it still suffers the exact same flaws in their Step 2 analysis preceding it.

Defendants' table *still* does not account for all elements. And in parsing out claim words apart from the rest of the claim, it also *still* does not account for any ordered combination. This is likewise fatal to Defendants' motion. *Ultramercial*, 722 F.3d at 1344 ("it is inappropriate to dissect the claims into old and new elements …")

And that Defendants cannot meet their burden is especially true where, as here, there are many facts contradicting Defendants. *E.g*., '929 patent claims; Figures 1, 12A, 12B; col 1:15-col. 2:39; sol. 7:5-8:24; 9:31-10:53; 11:37-12:15; 23:15-26:43; *see also* '893 patent claims; Figs. 1, 16, 17A, 17B, col 1:41-2:59; 7:35-8:2; 9:4-10:2; 13:14-15:14; 23:48-26:6329:1-30:45. At the very least, to avoid a remand, a fully developed factual record is necessary to resolve all these would-be factual questions. *Aatrix Software*, 882 F.3d at 1125-27.

## IV. CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion.

Dated: April 15, 2019                         Respectfully submitted,


By: /s/ Reza Mirzaie
Marc A. Fenster (CA SBN 181067)
Email: mfenster@raklaw.com

24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Brian D. Ledahl (CA SBN 186579)
Email: bledahl@raklaw.com
Reza Mirzaie (CA SBN 246953)
Email: rmirzaie@raklaw.com
Paul Kroeger (CA SBN 229074)
Email: pkroeger@raklaw.com
C. Jay Chung (CA SBN 252794)
Email: jchung@raklaw.com
Philip X. Wang (CA SBN 262239)
Email: pwang@raklaw.com
RUSS AUGUST & KABAT
12424 Wilshire Boulevard, 12th Floor
Los Angeles, CA 90025
Telephone: 310/826-7474
Facsimile 310/826-6991

**Attorneys for Plaintiff**
**Data Scape Limited**

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was served on all counsel of record via electronic service on April 15, 2019.

/s/ Reza Mirzaie